**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PERRY CAPITAL LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>JACOB J. LEW, *et al.*,<br><br>        Defendants. | Civil Action No. 1:13-cv-1025-RCL |
| FAIRHOLME FUNDS, INC., *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>FEDERAL HOUSING FINANCE AGENCY, *et al.*,<br><br>        Defendants. | Civil Action No. 13-1053-RCL |
| ARROWOOD INDEMNITY COMPANY, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>FEDERAL NATIONAL MORTGAGE ASSOCIATION, *et al.*,<br><br>        Defendants. | Civil Action No. 13-1439-RCL |

**PLAINTIFFS PERRY CAPITAL LLC, FAIRHOLME FUNDS, INC., FAIRHOLME FUND, BERKLEY INSURANCE COMPANY, ACADIA INSURANCE COMPANY, ADMIRAL INDEMNITY COMPANY, ADMIRAL INSURANCE COMPANY, BERKLEY REGIONAL INSURANCE COMPANY, CAROLINA CASUALTY INSURANCE COMPANY, MIDWEST EMPLOYERS CASUALTY INSURANCE COMPANY, NAUTILUS INSURANCE COMPANY, PREFERRED EMPLOYERS INSURANCE COMPANY, ARROWOOD INDEMNITY COMPANY, ARROWOOD SURPLUS LINES INSURANCE COMPANY, AND FINANCIAL STRUCTURES LIMITED**

**REPLY IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT ON ADMINISTRATIVE PROCEDURE ACT CLAIMS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 4

I.  Treasury's And FHFA's Jurisdictional Arguments Fail. ........................................ 4

  A.  Plaintiffs Have Article III Standing. .......................................................... 4

  B.  Plaintiffs Have Prudential Standing. ........................................................... 7

  C.  Plaintiffs' APA Claims Are Not Derivative, And Even If They Were, Section 4617(b)(2)(A) Would Permit Them. ................................................ 9

  D.  HERA's Jurisdictional Provision Does Not Prohibit Plaintiffs' Claims. ................ 12

II.  The Sweep Amendment Exceeded Treasury's Authority Under HERA. ........................ 18

  A.  Treasury Did Not Exercise Any Right Received In Connection With Its Prior Purchase Of The Companies' Securities When It Executed The Sweep Amendment. ............................................................................. 18

  B.  The Sweep Amendment Was A Purchase Of The Companies' Securities Or Obligations. ............................................................................. 20

III.  FHFA's Conduct Violates The APA. ..................................................................... 26

  A.  FHFA's Failure To Compile An Administrative Record Deprives This Court Of A Basis To Uphold The Sweep Amendment. ...................................... 26

  B.  FHFA Violated the APA By Acting In Excess Of Its Statutory Authority As Conservator. ............................................................................. 29

IV.  Treasury And FHFA Acted Arbitrarily And Capriciously. ........................................ 39

  A.  Treasury And FHFA Failed To Consider The Congressionally Required Factors. ............................................................................. 39

  B.  Treasury And FHFA Did Not Engage In Reasoned Decisionmaking. .................... 40

  C.  Treasury And FHFA Acted Arbitrarily And Capriciously By Breaching Their Fiduciary Duties To The Companies' Shareholders. .................................. 46

V.  Vacatur Is Required. ........................................................................................... 48

CONCLUSION .................................................................................................................. 50

# TABLE OF AUTHORITIES

**Page**

## Cases

*7547 Corp. v. Parker & Parsley Dev. Partners, L.P.,*
38 F.3d 211 (5th Cir. 1994) ............................................................. 22

*Abbott Bldg. Corp. v. United States,*
951 F.2d 191 (9th Cir. 1991) ............................................................ 14

*Adagio Investment Holding Ltd. v. FDIC,*
338 F. Supp. 2d 71 (D.D.C. 2004) .................................................... 13

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
988 F.2d 146 (D.C. Cir. 1993) ......................................................... 49

*Am. Bioscience, Inc. v. Thompson,*
269 F.3d 1077 (D.C. Cir. 2001) ....................................................... 49

*AmBase Corp. v. United States,*
112 Fed. Cl. 179 (2013) ................................................................... 36

*BellSouth Telecomms., Inc. v. FCC,*
469 F.3d 1052 (D.C. Cir. 2006) ....................................................... 40

*Bennett v. Spear,*
520 U.S. 154 (1997) ........................................................................... 7

*Birdville Indep. Sch. Dist. v. Hurst Assocs.,*
806 F. Supp. 122 (N.D. Tex. 1992) .................................................. 17

*BNP Paribas Energy Trading GP v. FERC,*
743 F.3d 264 (D.C. Cir. 2014) ......................................................... 50

*Bragdon v. Abbott,*
524 U.S. 624 (1998) ......................................................................... 36

*Castleglen, Inc. v. Commonwealth Sav. Ass'n,*
728 F. Supp. 656 (D. Utah 1989) ....................................................... 7

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
401 U.S. 402 (1971) ......................................................................... 26

\* *City of Arlington v. FCC,*
133 S. Ct. 1863 (2013) ..................................................................... 13

*Clifford v. Peña,*
77 F.3d 1414 (D.C. Cir. 1996) ......................................................... 28

*Cnty. of Sonoma v. FHFA,*
710 F.3d 987 (9th Cir. 2013) ........................................................... 33

*Consumer Fed'n of Am. & Pub. Citizen v. U.S. Dep't of Health & Human Servs.,*
83 F.3d 1497 (D.C. Cir. 1996) ......................................................... 28

# TABLE OF AUTHORITIES
## (Continued)

### Cases
### (Continued)

<u>Page(s)</u>

*Courtney v. Halleran,*
485 F.3d 942 (7th Cir. 2007) ................................................................. 13

*Davis Trust Co. v. Hardee,*
85 F.2d 571 (D.C. Cir. 1936) ................................................................. 38

*De Sylva v. Ballentine,*
351 U.S. 570 (1956)................................................................................ 38

*Del E. Webb McQueen Dev. Corp v. RTC,*
69 F.3d 355 (9th Cir. 1995) ................................................................... 29

*Delta Air Lines, Inc. v. Export-Import Bank of U.S.,*
718 F.3d 974 (D.C. Cir. 2013) ............................................................... 50

*Delta Sav. Bank v. United States,*
265 F.3d 1017 (9th Cir. 2001) ............................................................... 11

*Deutsche Bank Nat'l Trust Co. v. FDIC,*
717 F.3d 189 (D.C. Cir. 2013)................................................................ 44

*Dittmer Props., L.P. v. FDIC,*
708 F.3d 1011 (8th Cir. 2013) .......................................................... 15, 16

*Domestic Sec., Inc. v. SEC,*
333 F.3d 239 (D.C. Cir. 2003)................................................................ 42

*Dorris v. FDIC,*
No. Civ. 93-1659, 1994 WL 774535 (D.D.C. Oct. 27, 1994) ................ 42

*Esther Sadowsky Testamentary Trust v. Syron,*
639 F. Supp. 2d 347 (S.D.N.Y. 2009) ................................................... 11

*FAIC Sec., Inc. v. United States,*
768 F.2d 352 (D.C. Cir. 1985).................................................................. 7

*FDIC v. United States,*
51 Fed. Cl. 265 (2001)............................................................................ 36

*First Hartford Corp. Pension Plan & Trust v. United States,*
194 F.3d 1279 (Fed. Cir. 1999) ............................................................. 11

*First Ind. Fed. Sav. Bank v. FDIC,*
964 F.2d 503 (5th Cir. 1992) ................................................................... 6

*Fla. Power & Light Co. v. Lorion,*
470 U.S. 729 (1985)........................................................................... 49, 50

*Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.,*
493 U.S. 331 (1990)............................................................................... 8, 9

# TABLE OF AUTHORITIES
## (Continued)

### Cases
### (Continued)

<u>Page(s)</u>

*Freeman v. FDIC,*
56 F.3d 1394 (D.C. Cir. 1995) ................................................................. 13, 31, 32

*Furgatch v. RTC,*
No. 93-20304, 1993 WL 149084 (N.D. Cal. Apr. 30, 1993) ............................ 15, 16

*GameFly, Inc. v. Postal Regulatory Comm'n,*
704 F.3d 145 (D.C. Cir. 2013) ................................................................................. 50

*Gatz v. Ponsoldt,*
925 A.2d 1265 (Del. 2007) ......................................................................................... 9

*Geier v. Am. Honda Motor Co., Inc.,*
529 U.S. 861 (2000) ................................................................................................. 10

*Gelles v. TDA Indus., Inc.,*
44 F.3d 102 (2d Cir. 1994) ...................................................................................... 22

* *Gentile v. Rossette,*
906 A.2d 91 (Del. 2006) ........................................................................................ 8, 9

*Goldstein v. FDIC,*
No. 11-1604, 2014 WL 69882 (D. Md. Jan. 8, 2014) ................................................ 6

*Gosnell v. FDIC,*
No. 90-1266, 1991 WL 533637 (W.D.N.Y. Feb. 4, 1991),
*aff'd*, 938 F.2d 372 (2d Cir. 1991) ......................................................................... 14

*Gross v. Bell Savings Bank Pa SA,*
974 F.2d 403 (3d Cir. 1992) .................................................................................... 12

*GTS 900F, LLC v. FDIC,*
No. 11-cv-06607, 2012 WL 2086305 (C.D. Cal. June 1, 2012) ............................. 42

*Heartland Regional Med. Ctr. v. Sebelius,*
566 F.3d 193 (D.C. Cir. 2009) ................................................................................. 50

*Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela,*
971 F. Supp. 2d 49 (D.D.C. 2013) ............................................................................ 9

*Hindes v. FDIC,*
137 F.3d 148 (3d Cir. 1998) .............................................................................. 15, 16

*Houlihan v. Anderson-Stokes, Inc.,*
434 F. Supp. 1330 (D.D.C. 1977) ........................................................................... 23

*In re Fed. Home Loan Mortg. Corp. Derivative Litig.,*
643 F. Supp. 2d 790 (E.D. Va. 2009) ............................................................... 11, 15

# TABLE OF AUTHORITIES
## (Continued)

### Cases
### (Continued)

**Page(s)**

*In re Tri-Star Pictures, Inc., Litig.*,
634 A.2d 319 (Del. 1993) ........................................................................ 8

*Ind. Boxcar Corp. v. R.R. Ret. Bd.*,
712 F.3d 590 (D.C. Cir. 2013) ............................................................... 50

*Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*,
672 F. Supp. 1 (D.D.C. 1986) ............................................................... 36

\* *Int'l Ladies' Garment Workers' Union v. Donovan*,
722 F.2d 795 (D.C. Cir. 1983) ................................................. 41, 42, 45

*Int'l Union, United Mine Workers of Am. v. MSHA*,
626 F.3d 84 (D.C. Cir. 2010) ................................................................ 46

*Isquith by Isquith v. Caremark Int'l, Inc.*,
136 F.3d 531 (7th Cir. 1998) ................................................................ 23

*Jacobson v. AEG Capital Corp.*,
50 F.3d 1493 (9th Cir. 1995) ................................................................ 22

*James Madison Ltd. by Hecht v. Ludwig*,
82 F.3d 1085 (D.C. Cir. 1996) .............................................................. 12

*James Madison Ltd. by Hecht v. Ludwig*,
868 F. Supp. 3 (D.D.C. 1994) ............................................................... 42

*Katz v. Gerardi*,
655 F.3d 1212 (10th Cir. 2011) ............................................................ 23

*Kellmer v. Raines*,
674 F.3d 848 (D.C. Cir. 2012) ......................................................... 11, 38

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
674 F. Supp. 2d 483 (S.D.N.Y. 2009) .............................................. 15, 16

*La. Mun. Police Emps. Ret. Sys. v. FHFA*,
434 F. App'x 188 (4th Cir. 2011) ......................................................... 11

*Leon Cnty. v. FHFA*,
700 F.3d 1273 (11th Cir. 2012) ............................................................ 33

*LNV Corp. v. Outsource Serv. Mgmt., LLC*,
No. 13-cv-1926, 2014 WL 834977 (D. Minn. Mar. 4, 2014) ................ 17

*Loral Space & Commc'ns, Inc. v. Highland Crusader Offshore Partners, L.P.*,
977 A.2d 867 (Del. 2009) ....................................................................... 9

*Lorillard v. Pons*,
434 U.S. 575 (1978) .............................................................................. 11

# TABLE OF AUTHORITIES
### (Continued)

### Cases
### (Continued)

**Page(s)**

\* *Loving v. IRS*,
    742 F.3d 1013 (D.C. Cir. 2014) ............................................................................. 24

*Marcum v. Salazar*,
    751 F. Supp. 2d 74 (D.D.C. 2010) ..................................................................... 27, 28

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    132 S. Ct. 2199 (2012) ......................................................................................... 44

*MBIA Ins. Corp. v. FDIC*,
    708 F.3d 234 (D.C. Cir. 2013) ............................................................................. 36

*MBIA Ins. Corp. v. FDIC*,
    816 F. Supp. 2d 81 (D.D.C. 2011) ....................................................................... 35

*McAllister v. RTC*,
    201 F.3d 570 (5th Cir. 2007) ............................................................................... 29

\* *MCI Telecomms. Corp v. AT&T*,
    512 U.S. 218 (1994) ............................................................................................. 20

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) ............................................................................. 47

*Menkes v. Dep't of Homeland Sec.*,
    486 F.3d 1307 (D.C. Cir. 2007) ........................................................................... 28

*Menkes v. U.S. Dep't of Homeland Sec.*,
    637 F.3d 319 (D.C. Cir. 2011) ............................................................................. 28

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ......................................................................................... 41, 43

*Murphey v. Hillwood Villa Assocs.*,
    411 F. Supp. 287 (S.D.N.Y. 1976) ...................................................................... 23

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
    145 F.3d 1399 (D.C. Cir. 1998) ........................................................................... 49

*Nat'l Trust for Historic Pres. in U.S. v. FDIC*,
    995 F.2d 238 (D.C. Cir. 1993),
    *as modified*, 21 F.3d 469 (D.C. Cir. 1994) ................................................... 13, 14

*O'Melveny & Myers v. FDIC*,
    512 U.S. 79 (1994) ............................................................................................... 10

*Pareto v. FDIC*,
    139 F.3d 696 (9th Cir. 1998) ............................................................................... 11

# TABLE OF AUTHORITIES
## (Continued)

### Cases
### (Continued)

<u>Page(s)</u>

*Parfi Holding AB v. Mirror Image Internet, Inc.*,
   817 A.2d 149 (Del. 2002) ................................................................. 47

*Pension Benefit Guaranty Corp. v. LTV Corp.*,
   496 U.S. 633 (1990) ........................................................................ 48

\* *Plaintiffs in All Winstar-Related Cases v. United States*,
   44 Fed. Cl. 3 (1999) ........................................................... 7, 10, 11

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*,
   374 F.3d 1209 (D.C. Cir. 2004) ..................................................... 40

*Reno v. Catholic Soc. Servs., Inc.*,
   509 U.S. 43 (1993) .......................................................................... 16

*RTC v. CedarMinn Building Ltd. Partnership*,
   956 F.2d 1446 (8th Cir. 1992) .................................................. 32, 33

*Sacks v. Reynolds Sec., Inc.*,
   593 F.2d 1234 (D.C. Cir. 1978) ..................................................... 23

*Safe Extensions, Inc. v. FAA*,
   509 F.3d 593 (D.C. Cir. 2007) ....................................................... 27

*SEC v. Nat'l Sec. Inc.*,
   393 U.S. 453 (1969) ........................................................................ 21

*Sierra Club v. EPA*,
   167 F.3d 658 (D.C. Cir. 1999) ....................................................... 49

*Smallwood v. Pearl Brewing Co.*,
   489 F.2d 579 (5th Cir. 1974) .......................................................... 22

*Starr Int'l Co. v. United States*,
   106 Fed. Cl. 50 (2012) ...................................................................... 8

*Stommel v. LNV Corp.*,
   No. 2:13CV821DAK, 2014 WL 1340676 (D. Utah Apr. 4, 2014) ......... 17

*Telematics Int'l, Inc. v. NEMLC Leasing Corp.*,
   967 F.2d 703 (1st Cir. 1992) ..................................................... 15, 16

*Telocator Network of Am. v. FCC*,
   691 F.2d 525 (D.C. Cir. 1982) ....................................................... 41

*Tenn. Gas Pipeline Co. v. FERC*,
   926 F.2d 1206 (D.C. Cir. 1991) ..................................................... 33

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
   845 A.2d 1031 (Del. 2004) ............................................................... 8

## TABLE OF AUTHORITIES
### (Continued)

### Cases
### (Continued)

**Page(s)**

*Union Nat'l Bank of Chi. v. Weaver,*
604 F.2d 543 (7th Cir. 1979) .................................................................... 46

*United States v. Petty Motor Co.,*
327 U.S. 372 (1946) ................................................................................. 19

*United States v. Woods,*
134 S. Ct. 557 (2013) ............................................................................... 38

*Venetian Casino Resort, LLC v. EEOC,*
530 F.3d 925 (D.C. Cir. 2008) ................................................................ 48

*Verizon v. FCC,*
740 F.3d 623 (D.C. Cir. 2014) ................................................................ 40

*Ward v. RTC,*
996 F.2d 99 (5th Cir. 1993) ............................................................... 12, 13

* *Whitman v. Am. Trucking Ass'ns,*
531 U.S. 457 (2001) ................................................................................. 20

### Statutes

* 5 U.S.C. § 702 ............................................................................................. 7

* 5 U.S.C. § 706 ........................................................................................... 26

12 U.S.C. § 1719(g) ............................................................................ *passim*

12 U.S.C. § 4617(a) ............................................................................... 30, 37

12 U.S.C. § 4617(b) ............................................................................. *passim*

12 U.S.C. § 4617(c) ..................................................................................... 6

12 U.S.C. § 4617(e) ............................................................................... 5, 6, 7

12 U.S.C. § 4617(f) .............................................................................. *passim*

12 U.S.C. § 4617(i) ..................................................................................... 6

15 U.S.C. § 78j(b) ...................................................................................... 22

### Regulations

26 C.F.R. § 1.1001-3 .................................................................................. 24

74 Fed. Reg. 59,540 (Nov. 18, 2009) ......................................................... 36

76 Fed. Reg. 35,724 (June 20, 2011) .......................................................... 29

78 Fed. Reg. 76,269 (Dec. 17, 2013) .......................................................... 49

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

### Other Authorities

*Black's Law Dictionary* (9th ed. 2009) ............................................................. 20, 32, 36

David H. Carpenter & M. Maureen Murphy, Cong. Res. Serv., RL34657, *Financial Institution Insolvency: Federal Authority over Fannie Mae, Freddie Mac, and Depository Institutions* (2008) ........................................................................ 30, 37

Dep't of Treasury, *Treasury Dep't Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac* (Aug. 17, 2012) .......................................................... 30

Dep't of Treasury's Mem. in Supp. of Mot. to Dismiss, *Continental W. Ins. Co. v. FHFA*, No. 14-cv-42-RP-RAW (S.D. Iowa Apr. 29, 2014) .................................................. 18

E. Allan Farnsworth, *Farnsworth on Contracts* (3d ed. 2004) ...................................... 18

Eric C. Chafee, *Standing Under Section 10(b) & Rule 10b-5: The Continued Validity of the Forced Seller Exception to the Purchaser-Seller Requirement*, 11 U. Pa. J. Bus. L. 843 (2009) ................................................................................................ 23

FDIC, *Managing the Crisis* (1998) ........................................................................ 36

FHFA, *2012 Report to Congress* (June 13, 2013) ...................................................... 30

*Fletcher Cyclopedia of the Law of Corporations* (2011 rev. vol.) ......................... 10, 34

H.R. Rep. No. 101-222 (1989) ................................................................................ 6

IRS Rev. Rul. 81-160 (June 8, 1981) ...................................................................... 25

IRS, Action on Decision (IRB No. 2013-32 Aug. 5, 2013) ......................................... 25

N. Eric Weiss, Cong. Research Serv., RL34661, *Fannie Mae's and Freddie Mac's Financial Problems* (Aug. 10, 2012) ...................................................................... 34

O.T.S. Gen. Couns. Mem. 92/RLD-6102 (Mar. 11, 1992), 1992 WL 12005212 ....................... 36

Order, *Fairholme Funds, Inc. v. United States*, No. 13-465 C (Fed. Cl. Apr. 4, 2014) .............. 29

*Oxford English Dictionary* Online (Dec. 2013) .......................................................... 36

Sandra S. Stern, *Structuring & Drafting Comm. Loan Agreements* .................................. 25, 44

Tobias Berg *et al.*, The Total Costs of Corporate Borrowing: Don't Ignore the Fees (May 8, 2013) ................................................................................................... 44

U.C.C. § 1-201 ................................................................................................. 20

*Williston on Contracts* (4th ed. 2014) .................................................................... 19

## INTRODUCTION

By the end of this month, FHFA, charged by statute with a mandate of conserving and preserving the assets of Fannie Mae and Freddie Mac, will have sent $158 billion from the Companies' treasuries to the government's Treasury pursuant to the Net Worth Sweep—$130 billion more than Treasury previously would have received under the 10 percent fixed dividend provided in its stock agreements.  Treasury and FHFA would have this Court believe that they had no idea the Net Worth Sweep would give Treasury such a windfall.  The Net Worth Sweep was needed, the agencies say, to save the Companies from a "downward spiral" caused by borrowing money from Treasury to pay Treasury a cash dividend that could have been paid in-kind, without any borrowing.  In their view, the massive transfer of wealth to Treasury is just a happy (for the government) coincidence.

Of course, FHFA and Treasury are desperate to prevent this Court from looking too closely at this narrative.  And for good reason, as the contemporaneous statements from the agencies in 2012 reveal a very different rationale for the Sweep Amendment:  to prevent the Companies from "retain[ing] profits" or "rebuild[ing] capital," to begin the "winding up" of the Companies' affairs, and to "ensure [that] existing common equity holders will not have access to any positive earnings from the [Companies] in the future."

The agencies had no authority to embark on that course in 2012.  Accordingly, Plaintiffs ask this Court to vacate the illegal Sweep Amendment.

This Court has jurisdiction.  Treasury and FHFA raise a host of frivolous and irrelevant challenges to Plaintiffs' standing to bring their APA claims.  But none of these charges undermines Plaintiffs' core injury:  the Sweep Amendment guarantees that the liquidation preferences in Plaintiffs' preferred stock are worthless.  This harm constitutes a direct injury, one

that does not belong to the Companies; the agencies' invocation of prudential standing notions and FHFA's authority to prosecute derivative litigation thus has no applicability here.

Similarly, HERA's limitation on judicial review—12 U.S.C. § 4617(f)—is no bar to Plaintiffs' APA claims.  That provision prohibits suits that "restrain or affect the exercise or functions of [FHFA] as conservator" and thus does not prohibit suit where, as here, FHFA exceeds its conservatorship authority or acts in a role that is plainly not that of a conservator. And the section has no relevance at all to claims against Treasury.

On the merits, HERA provided explicitly that, after 2009, Treasury was permitted only to exercise rights it had received in connection with the Companies' securities.  Treasury's argument that the Purchase Agreements granted it a "right" to agree with FHFA to amend the Purchase Agreements is risible, as a "right to amend" is not a right that Treasury received in the Purchase Agreements; the capacity of the parties to agree to amend their contract exists wholly apart from their Purchase Agreements.  The Sweep Amendment is best understood as a purchase—under the term's ordinary meaning, the securities laws, and Treasury's own tax regulations—in which Treasury exchanged its old securities bearing a fixed-rate dividend for brand-new securities granting Treasury all the Companies' net worth in perpetuity.  Under any view of the facts, Treasury exceeded its statutory authority by executing the Sweep Amendment.

FHFA's contentions that the Sweep Amendment is consistent with its conservatorship authority similarly fall flat.  As the Companies' conservator, FHFA is obligated to preserve and conserve their assets with a view to the Companies' rehabilitation or, as FHFA once said, the resumption of "normal business operations."  It is obliged to place the Companies in a safe and solvent condition, which means working to build a capital cushion that would help the Companies withstand an economic downturn.  The Sweep Amendment renders those goals

impossible, as it confines the Companies to a zombie-like existence, giving Treasury all of its available capital in good quarters, and living off the dole in others.  Indeed, the one-sidedness of the Sweep Amendment and the absence of any evidence that FHFA exercised its independent judgment about the need to alter the existing dividend arrangement show that FHFA violated HERA by acting at Treasury's direction.  FHFA claims that its powers to transfer the Companies' assets or otherwise to act in the Companies' or FHFA's best interests provide authority to agree to a Net Worth Sweep, but those "powers" are limited by the fundamental goal of any conservatorship, which is to preserve the entity as a going concern.  FHFA's argument that it may "wind down" the Companies in preparation for liquidation collapses any distinction between receivers and conservators, as it would give conservators authority to ransack the Companies, with receivers left only to turn out the lights.  HERA does not authorize such an irresponsible form of "conservatorship."

Treasury and FHFA executed the Sweep Amendment contrary to the limited authority given them by Congress; they also did so arbitrarily and capriciously.  The agencies ignored salient data, including the Companies' tens of billions of dollars in deferred tax assets; they failed to consider obvious alternative solutions that would have solved the "problem" FHFA and Treasury perceived, without harming the Companies' shareholders or the Companies themselves; and they never considered the congressionally required factors—a point that neither agency disputes.  The agencies seek to hide behind purported deference owed to "predictive judgments."  But the law is clear that agencies always must act rationally and consider alternatives.

The rule of law demands that federal agencies obey the limits imposed by Congress, even during difficult economic times.  No legal principle supports Treasury's massive money grab, and nothing in HERA or any other law prohibits this Court from vacating the illegal Sweep

Amendment.  This Court must act to ensure that FHFA and Treasury act lawfully, lest other agencies also decide that the APA and organic statutes may be overridden or ignored.

## ARGUMENT

### I.      Treasury's And FHFA's Jurisdictional Arguments Fail.

In an attempt to evade judicial scrutiny, Treasury and FHFA raise four preliminary, and at times contradictory, objections to Plaintiffs' APA claims.  FHFA argues that Plaintiffs lack Article III standing, but does not challenge Plaintiffs' prudential standing.  Treasury takes the reverse tack, arguing that Plaintiffs lack prudential standing, but not Article III standing.  Treasury also claims that the APA claims are barred by a provision of HERA, 12 U.S.C. § 4617(b)(2)(A), that permits FHFA to substitute itself for plaintiffs in derivative actions, but FHFA—the only party in a position to raise such an objection—makes no similar argument as to Plaintiffs' APA claims.  The agencies finally both argue that 12 U.S.C. § 4617(f) deprives this Court of jurisdiction to hear claims against Treasury and FHFA, even though that statute says nothing about Treasury and *only* governs claims against FHFA, and then *only if* FHFA is acting within its authority as conservator.  Each of these objections to judicial review lacks merit.

### A.      Plaintiffs Have Article III Standing.

Plaintiffs previously explained that they have Article III standing to challenge the Sweep Amendment because the Amendment ensures that Plaintiffs will be unable to recover their liquidation preference and depresses the value of their stock.  *See* APA Br. 21-23.[1]  Treasury apparently agrees, never questioning Plaintiffs' Article III standing.

---

[1]  Citations to the briefs and record refer to No. 13-cv-1025 unless otherwise indicated.  Citations to "FHFA" documents refer to the "Document Compilation" filed by FHFA on December 17, 2013 (Dkt. 27); citations to "Treasury" documents refer to the Administrative Record filed by Treasury on December 17, 2013 (Dkt. 26); "FHFA Opening Br." refers to the FHFA Defendants' Memorandum in Support of Motion to Dismiss filed on January 17, 2014 (Dkt. 32); "Treasury Opening Br." refers to the Treasury Defendants' Memorandum in Support of Their Motion to Dismiss filed on January 17, 2014 (Dkt. 31); "Treasury Reply" refers to the Treasury Defendants'

*(Cont'd on next page)*

FHFA hangs its Article III challenge entirely on 12 U.S.C. § 4617(e), which, according to FHFA, limits Plaintiffs' ability to obtain value for their shares. *See* FHFA Reply 17-21.  In full, Section 4617(e) provides:

(1) In general

Notwithstanding any other provision of Federal law or the law of any State, and regardless of the method which the Agency determines to utilize with respect to a regulated entity in default or in danger of default, including transactions authorized under subsection (i), this subsection shall govern the rights of the creditors of such regulated entity.

(2) Maximum liability

The maximum liability of the Agency, acting as receiver or in any other capacity, to any person having a claim against the receiver or the regulated entity for which such receiver is appointed shall be not more than the amount that such claimant would have received if the Agency had liquidated the assets and liabilities of the regulated entity without exercising the authority of the Agency under subsection (i).

12 U.S.C. § 4617(e).  According to FHFA, if the Companies are eventually liquidated, this provision limits Plaintiffs' recovery to what they would have received if the Companies had been liquidated in September 2008, and thus it is this statute rather than the Sweep Amendment that has caused Plaintiffs' injury.  *See* FHFA Reply 17.  That is wrong because FHFA has not placed the Companies in liquidation, and because, even in liquidation, this section has no bearing at all on Plaintiffs' liquidation preference.  *See* APA Br. 22-23.

Section 4617(e)(2) only limits the "*liability of the Agency*" to "not more than the amount that [the claimant] would have received if the Agency had liquidated the assets and liabilities of the regulated entity *without exercising the authority of the Agency under subsection (i)*."  12

*(Cont'd from previous page)*

Reply filed on May 2, 2014 (Dkt. 40); "FHFA Reply" refers to the FHFA Defendants' Reply filed on May 2, 2014 (Dkt. 42); "APA Br." refers to Plaintiffs' Memorandum in Opposition and in Support of their Cross-Motions for Summary Judgment filed on March 21, 2014 (Dkt. 37); "Supp. Br." refers to Plaintiffs' Supplemental Brief  filed on March 21, 2014 (No. 13-1053, Dkt. 39); and "FHFA Discovery Opp." refers to FHFA's Opposition to Plaintiffs' Motion for Supplementation of the Administrative Records filed on March 4, 2014 (No. 13-cv-1053 Dkt. 34).

U.S.C. § 4617(e)(2) (emphases added).  Subsection (i) authorizes FHFA "as receiver" to

organize a "limited-life regulated entity."  12 U.S.C. § 4617(i)(1).  In other words, Section

4617(e)(2) is meant to limit FHFA's liability if FHFA, as receiver, exercises its authority to

create a limited-life regulated entity.  This reading is consistent with Congress's explanation of a

parallel provision applicable to the FDIC:  "Current law is clarified with respect to FDIC's

liability in the event it elects to arrange an assisted acquisition or transfer of assets and liabilities

to a bridge bank in order to preserve or attempt to preserve the going concern value of an

institution."  H.R. Rep. No. 101-222, at 397 (1989).  But FHFA has never exercised its authority

under subsection (i), nor could it during conservatorship, as that power is reserved solely to a

receiver.  *See* 12 U.S.C. § 4617(i)(1)(A).  And even where FHFA is acting as receiver, the statute

just limits creditors' ability to look to the receiver to satisfy their claims against the Companies.

*See First Ind. Fed. Sav. Bank v. FDIC*, 964 F.2d 503, 507 (5th Cir. 1992) ("Congressional policy

requires that creditors of failed institutions look only to the assets of the institution for recovery

of their losses, and not to the taxpayers."); *Goldstein v. FDIC*, No. 11-1604, 2014 WL 69882, at

*6 (D. Md. Jan. 8, 2014) ("Put another way, if no receivership assets are available to satisfy the

claims of creditors, the creditors cannot recover from the FDIC as receiver.").

      Indeed, FHFA's argument that the value of a shareholder's residual claim against a

regulated entity in receivership remains fixed even if the entity's assets subsequently appreciate

cannot be correct.  A receiver that recovers unanticipated profits in liquidating the assets of a

company may not keep those profits for itself but must distribute them to claimants according to

statutory orders of priority, with shareholders entitled to residual funds remaining after

satisfaction of all other claims.  *See* 12 U.S.C. § 4617(c)(1); Treasury Reply 20-21 (shareholders

have a "direct, vested interest" in the surplus of potential recoveries after liquidation (quoting

*Plaintiffs in All Winstar-Related Cases v. United States*, 44 Fed. Cl. 3, 10 (1999))).  Even if

FHFA were someday to set up a limited-life regulated entity as part of its effort to wind up the

Companies, the agency's liability could only be fixed as of the date on which it placed the

Companies into *receivership*—not the earlier date when it established the conservatorships.  *See*

*Castleglen, Inc. v. Commonwealth Sav. Ass'n*, 728 F. Supp. 656, 675 (D. Utah 1989) (where

regulated entity was first placed into conservatorship and then receivership, analogous FIRREA

provision capped regulator's liability as of day entity was placed into receivership).[2]

Section 4617(e) does not limit at all Plaintiffs' liquidation preference as to the Companies

and is wholly irrelevant to the Article III analysis.

## B.    Plaintiffs Have Prudential Standing.

Because Plaintiffs unquestionably have been aggrieved by the harm to their liquidation

preferences, that should end the standing inquiry under the APA.  *See* 5 U.S.C. § 702.  Treasury

nonetheless argues—again, without FHFA's support—that the prudential shareholder-standing

doctrine bars these claims.  As an initial matter, Plaintiffs have explained that the prudential

shareholder-standing doctrine does not override the APA.  *See* APA Br. 24-25.  Prudential

standing limits—including the shareholder-standing rule—"can be modified or abrogated by

Congress." *Bennett v. Spear*, 520 U.S. 154, 162 (1997).  As then-Judge Scalia explained,

"Congress itself has pared back traditional prudential limitations by the Administrative

Procedure Act.'" *FAIC Sec., Inc. v. United States*, 768 F.2d 352, 357 (D.C. Cir. 1985).

---

[2]  It also bears emphasis that Section 4617(e) applies to "*any* person having a claim against the receiver or the regulated entity," not just shareholders.  (Emphasis added).  FHFA's arguments thus apply with equal force to the Companies' *creditors*, meaning that under its interpretation of Section 4617(e), the Companies' bondholders and other counterparties would be limited during liquidation to whatever they could have recovered when the conservatorships were imposed on September 6, 2008.  Given that the concern that the Companies' "creditors were at great risk of sustaining massive losses" ostensibly justified the decision to place the Companies into conservatorship, FHFA Opening Br. 1, FHFA cannot possibly argue now that placing the Companies into conservatorship locked the Companies' creditors—including their preferred shareholders—into losses as of September 6, 2008.

But even if the shareholder-standing doctrine could apply to claims brought under the

APA, there is prudential standing when shareholders suffer "a direct, personal" injury.

*Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990).  Plaintiffs suffered

a direct injury because the Sweep Amendment extracted value from their shares and redistributed

it to the senior shareholder (Treasury).  APA Br. 24-25 (citing *Gentile v. Rossette*, 906 A.2d 91,

100 (Del. 2006); *In re Tri-Star Pictures, Inc., Litig.*, 634 A.2d 319, 330-32 (Del. 1993)).

Treasury seeks to distinguish *Gentile*—and presumably *Tri-Star Pictures*—on the ground

that the Sweep Amendment "had no effect on the 'voting power' of any shareholder."  Treasury

Reply 18.  But *Gentile* makes clear that deprivation of "economic value" and loss of "voting

power" are two distinct harms, and that a deprivation of either can constitute a "direct" injury.

*See* 906 A.2d at 100 ("Because the shares representing the 'overpayment' embody *both*

economic value *and* voting power, the end result of this type of transaction is an improper

transfer—or expropriation—of economic value *and* voting power from the public shareholders to

the majority or controlling stockholder." (emphases added)); *see also Tri-Star Pictures*, 634 A.2d

at 330 ("The injury sustained . . . is a loss manifested by both cash-value and voting power

dilution.").  Although Treasury was able to expropriate economic value without increasing its

voting power, that does not diminish Plaintiffs' economic injury or make it any less direct.  And

recognizing this harm would not—as Treasury claims—revive the "special injury" rule rejected

in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004).  *See* Treasury Reply

17-18.  The *Gentile* court made clear that its holding recognizing economic harm as direct injury

fits "comfortably within the analytical framework mandated by *Tooley*."  906 A.2d at 102; *see*

*also Starr Int'l Co. v. United States*, 106 Fed. Cl. 50, 65 (2012); *Loral Space & Commc'ns, Inc.*

*v. Highland Crusader Offshore Partners, L.P.*, 977 A.2d 867, 869-70 (Del. 2009); *Gatz v. Ponsoldt*, 925 A.2d 1265, 1277-81 (Del. 2007).

Treasury similarly seeks to distinguish *Helmerich & Payne International Drilling Co. v. Bolivarian Republic of Venezuela*, 971 F. Supp. 2d 49, 73 (D.D.C. 2013), because it concerned a physical seizure of a corporation. *See* Treasury Reply 25-26. But that court's analysis rested not simply on the physical seizure, but also on the "taking" of the corporation's "assets and profits," which the Sweep Amendment does here. *See Helmerich*, 971 F. Supp. 2d at 73.

Finally, Treasury contends that the Sweep Amendment should be characterized as a derivative injury because it effects a "waste of corporate assets." Treasury Reply 17, 25-26. But as both the United States and Delaware Supreme Courts have recognized, a single transaction may inflict both direct and derivative injuries. *See Alcan Aluminum*, 493 U.S. at 336 (holding that a suit is direct "even if the corporation's rights are also implicated"); *Gentile*, 906 A.2d at 99-100 ("Although the corporation suffered harm (in the form of a diminution of its net worth), the minority shareholders also suffered a harm that was unique to them and independent of any injury to the corporation."). The Sweep Amendment causes Plaintiffs direct injury by rendering their liquidation preferences worthless; that the Sweep Amendment *also* wastes corporate assets does not affect Plaintiffs' prudential standing.

> **C.**  **Plaintiffs' APA Claims Are Not Derivative, And Even If They Were, Section 4617(b)(2)(A) Would Permit Them.**

Echoing its prudential standing argument, Treasury—but not FHFA—contends that the APA claims are barred by 12 U.S.C. § 4617(b)(2)(A), which says that "FHFA as conservator immediately succeeds to . . . all rights, titles, powers, and privileges . . . of any stockholder . . . with respect to the regulated entity and the assets of the regulated entity." *See* Treasury Reply

9

15-23.  Treasury argues that this provision gives to FHFA any claims that arise from Plaintiffs'

status as shareholders.  This argument fails for at least three reasons.

*First*, this provision grants FHFA only the rights of a stockholder with respect to the

"regulated entity and the assets of the regulated entity," which is to say, derivative claims.  APA

Br. 24-27.  It does not give FHFA shareholders' rights with respect to claims for relief of injuries

directly suffered, including claims under the APA.  The Court of Federal Claims recognized as

much in *Winstar*, denying the receiver's motion to substitute itself as plaintiff in shareholders'

direct claims.  *See* 44 Fed. Cl. at 9-10.  Treasury seeks to distinguish *Winstar* because the failed

thrifts there were in liquidation.  *See* Treasury Reply 20-21.  But by recognizing that

shareholders have a "direct, vested interest" in the surplus of potential recoveries after

liquidation *and denying substitution on that ground*, *Winstar* rejected the contention that FHFA

can control direct suits.  *See* 44 Fed. Cl. at 11-12.  Indeed, Treasury cites not one example in

which a conservator or receiver moved to substitute itself as the proper party when shareholders

sue federal agencies under the APA.[3]  Because Plaintiffs' APA claims seek redress of injuries to

the shareholders themselves, Section 4617(b)(2)(A) cannot bar them.[4]

*Second*, Section 4617(b)(2)(A) gives FHFA the right, but not an obligation, to substitute

itself as plaintiff in a shareholder derivative action, and it has not done so here.  *See Kellmer v.*

---

[3]  Deeming APA suits derivative also would be at odds with the plain language of the APA and with important principles of federalism.  This approach would subject every federal APA claim by a shareholder to the patchwork complexities of state corporate law.  *See* 12B *Fletcher Cyclopedia of the Law of Corporations* § 5908 (2011 rev. vol.) ("[T]he shareholders' derivative action is surrounded by numerous restrictions that stem from the nature of the corporate structure.").  Perhaps recognizing this problem, Treasury suggests that it is "federal common law" that distinguishes derivative and direct claims here.  *See* Treasury Reply 16 n.5.  But there is no such thing as a federal corporate common law.  *See O'Melveny & Myers v. FDIC*, 512 U.S. 79, 83 (1994).  In any event, statutes like the APA displace common law—not the other way around.  *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869 (2000).

[4]  Treasury also invokes Section 4617(b)(2)(K)(i), Treasury Reply 19-20, but that provision is even further afield because (a) there has been no "appointment of the Agency as receiver," and (b) Plaintiffs' APA claims are not "against the assets or charter of the regulated entity."  12 U.S.C. § 4617(b)(2)(K)(i)).  Plaintiffs' APA claims seek to set aside the unlawful agency action of the Sweep Amendment.

*Raines*, 674 F.3d 848, 850 (D.C. Cir. 2012).  Indeed, in every case that Treasury cites, the

conservator or receiver moved to substitute itself or otherwise take control of the lawsuits.  *See*

Treasury Reply 19-22.[5]  FHFA does not join this challenge to the APA claims and has not asked

this Court to substitute itself in place of Plaintiffs.  *See* FHFA Reply 21-32.

       *Third*, and in any event, FHFA could not substitute itself as Plaintiff and direct dismissal

of the APA claims because of its manifest conflict of interest.  *See* APA Br. 27 (citing *Delta Sav.*

*Bank v. United States*, 265 F.3d 1017, 1021-24 (9th Cir. 2001); *First Hartford Corp. Pension*

*Plan & Trust v. United States*, 194 F.3d 1279,1295 (Fed. Cir. 1999); *Kellmer*, 674 F.3d at 850; *In*

*re Fed. Home Loan Mortg. Corp. Derivative Litig.*, 643 F. Supp. 2d 790, 798 (E.D. Va. 2009),

*aff'd sub nom. La. Mun. Police Emps. Ret. Sys v. FHFA.*, 434 F. App'x 188 (4th Cir. 2011).

       Treasury unconvincingly attempts to distinguish *First Hartford* and *Delta Savings Bank*

on the ground that both cases involved "pre-receivership claims."  Treasury Reply 22.  But none

of the relevant analysis turned on the timing of the claims, and Treasury gives no reason this

should matter.  *Delta Savings Bank* analyzed the relevant statute at length and concluded that it

supported a conflict-of-interest exception.  *See* 265 F.3d at 1021-24.  That standard is satisfied

here by the conflict inherent in the notion of FHFA suing itself and another executive agency.[6]

---

[5]  *See Kellmer*, 674 F.3d at 849; *Delta Sav. Bank v. United States*, 265 F.3d 1017, 1020 (9th Cir. 2001); *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1285 (Fed. Cir. 1999); *Pareto v. FDIC*, 139 F.3d 696, 698 (9th Cir. 1998); *In re Fed. Home Loan Mortg. Corp. Derivative Litig.*, 643 F. Supp. 2d 790, 795 (E.D. Va. 2009), *aff'd sub nom. La. Mun. Police Emps. Ret. Sys. v. FHFA*, 434 F. App'x 188 (4th Cir. 2011); *Esther Sadowsky Testamentary Trust v. Syron*, 639 F. Supp. 2d 347, 349 (S.D.N.Y. 2009); *Winstar*, 44 Fed. Cl. at 5.

[6]  Both agencies complain that Section 4617(b)(2)(A)—in speaking of "rights, titles, powers, and privileges"—makes no mention of a conflict-of-interest exception for derivative suits.  *See* Treasury Reply 22; FHFA Reply 25-26.  But by borrowing from FIRREA language that courts had construed to contain a conflict-of-interest exception, Congress adopted this exception.  *See, e.g., Lorillard v. Pons*, 434 U.S. 575, 581 (1978).  And as *Delta Savings Bank* explained, the exception rests in the derivative right itself, which recognizes special rules when corporate officers have conflicts of interest.  *See* 265 F.3d at 1022.

### D.     HERA's Jurisdictional Provision Does Not Prohibit Plaintiffs' Claims.

In a final ploy to evade review, the agencies invoke 12 U.S.C. § 4617(f), which states: "Except as provided in this section or at the request of the Director, no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator or a receiver." But because the Sweep Amendment exceeded FHFA's authority as conservator, the provision does not bar Plaintiffs' challenge to that *ultra vires* agency action. And even if *FHFA* had acted within its authority, claims that *Treasury* exceeded its authority still could proceed.

### 1.     Section 4617(f) Does Not Prohibit The Claims Against FHFA.

Section 4617(f) does not bar claims that FHFA exceeded its conservatorship authority. *See* APA Br. 31-34. Here, FHFA overstepped its conservatorship authority by executing the Sweep Amendment. *See* Part III, *infra*; APA Br. 46-74. Section 4617(f) therefore does not bar these APA claims. FHFA and Treasury attempt to confuse this straightforward analysis, presenting the wrong legal standards and ignoring controlling D.C. Circuit precedent.

FHFA and Treasury start by asserting that Section 4617(f) bars claims unless FHFA's actions are "clearly contrary"—as opposed to "contrary"—to its conservatorship authority. *See* FHFA Reply 5, 8-9; Treasury Reply 8 (citing *Gross v. Bell Savings Bank Pa SA*, 974 F.2d 403 (3d Cir. 1992); *Ward v. RTC*, 996 F.2d 99 (5th Cir. 1993)). This is not the law in this Circuit, which has consistently held that courts maintain jurisdiction when the conservator acts "beyond, or contrary to, its statutorily prescribed, constitutionally permitted, powers or functions." *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1093 (D.C. Cir. 1996); *Freeman v. FDIC*, 56

F.3d 1394, 1398 (D.C. Cir. 1995); *Nat'l Trust for Historic Pres. in U.S. v. FDIC*, 995 F.2d 238, 240 (D.C. Cir. 1993), *modified on other grounds*, 21 F.3d 469 (D.C. Cir. 1994).[7]

The agencies next contend that Plaintiffs' APA claims merely attack the wisdom or efficacy of the Sweep Amendment, FHFA Reply 7-11; Treasury Reply 7-9, rather than establish that the amendment is contrary to FHFA's power as conservator. But that distorts Plaintiffs' challenge: "[T]he question—whether framed as an incorrect application of agency authority or an assertion of authority not conferred—is always whether the agency has gone beyond what Congress has permitted it to do." *City of Arlington v. FCC*, 133 S. Ct. 1863, 1869 (2013).

FHFA contends that as long as its acts can be characterized as an exercise of a power listed in Section 4617(b), then it is acting within its power as conservator. Thus FHFA argues that because a conservator has power to sell or transfer assets under Section 4617(b)(2)(G), then any transfer of an asset is an exercise of conservatorship power immune from judicial review. But this Court's decision in *Adagio Investment Holding Ltd. v. FDIC*, 338 F. Supp. 2d 71 (D.D.C. 2004), refutes that reasoning, holding instead that even where conservators or receivers have "broad powers" to transfer assets, an agency can still exceed its statutory authority. *Id.* at 81-82. FHFA attempts to distinguish *Adagio* on the basis that it did not discuss the statutory limitation on judicial review of actions of the FDIC as conservator or receiver. But that is only because, as here, that limitation on judicial review has no application when the conservator or receiver acts beyond its statutory authority.[8]

---

[7] Even under Defendants' incorrect and artificially high standard, it is difficult to imagine conduct more "clearly contrary" to a conservator's role than looting a company's assets for the benefit of the conservator's friend.

[8] The agencies' authorities are not to the contrary. *See* FHFA Reply 9; Treasury Reply 8-9. In *Ward*, for example, the plaintiff alleged that while selling a building during liquidation, the Resolution Trust Corporation ("RTC") "failed to maximize the net present value return" on an asset sale. 996 F.2d at 103. *Ward* is thus far afield: A decision regarding a receiver's power during a liquidation sale has little to teach regarding the limits of a conservator's power. So, too, with *Courtney v. Halleran*, 485 F.3d 942 (7th Cir. 2007), where the receiver settled a

*(Cont'd on next page)*

The D.C. Circuit repeatedly has said that provisions like Section 4617(f) bar claims only when the agency has not acted "beyond or contrary to" its statutory mandate. Plaintiffs' challenge to the Sweep Amendment as contravening FHFA's statutory mandate as conservator thus does not "plead . . . around" Section 4617(f), Treasury Reply 7; rather, it enforces the line Congress drew. This Court must reach the merits.[9]

## 2.    Section 4617(f) Does Not Prohibit The Claims Against Treasury.

Even if Section 4617(f) protects FHFA—which it does not—it cannot insulate Treasury's actions. As Plaintiffs have explained, adjudicating whether a third party acted illegally "does not affect the [conservator's] own powers[;] it simply leaves the determination of third party rights in the hands of the courts." *Abbott Bldg. Corp. v. United States*, 951 F.2d 191, 195 (9th Cir. 1991); *see* APA Br. 30.[10] If this Court holds that Treasury violated the APA because the Sweep Amendment exceeded its authority under HERA or because Treasury acted arbitrarily and capriciously, that order will have no bearing on *FHFA's* powers as conservator, nor would it subject FHFA's actions to "outside second guessing." *See* Treasury Reply 14. Indeed, because

---

*(Cont'd from previous page)*

lawsuit for what the plaintiffs believed was an inadequate sum. In that case, plaintiffs did not contend that the settlement otherwise exceeded the receiver's authority. *See id.* at 949.

[9] The same analysis goes for the APA "arbitrary and capricious" claims against FHFA. *See* APA Br. 34-36. FHFA argues that "[t]o determine whether Section 4617(f) applies . . . the Court must answer but a single question: whether the Conservator was acting within its enumerated powers and functions *under HERA*." FHFA Reply 5. But because HERA of course does not authorize FHFA to act arbitrarily, capriciously, or irrationally, Section 4617(f) does not bar claims that FHFA violated the law by acting in such a manner. *See Gosnell v. FDIC*, No. 90-1266, 1991 WL 533637, at *6 (W.D.N.Y. Feb. 4, 1991) (interpreting FIRREA's analogous provision and observing that receiver is not "wholly above the law" and that "truly ultra vires or arbitrary and capricious acts on its part may be enjoined"), *aff'd*, 938 F.2d 372 (2d Cir. 1991).

[10] Treasury tries to cast doubt on *Abbott Building*. It first notes that the D.C. Circuit distinguished *Abbott Building* in *National Trust*. *See* Treasury Reply 13. But the D.C. Circuit in *National Trust* found "no need to discuss" *Abbott Building* because its facts—involving unlawful acts by a third party—were "far removed" from the claims in *National Trust* involving misdeeds by a receiver. 21 F.3d at 471 n.1 ("Given the limited scope of this holding, in a situation far removed from this case, we see no need to discuss whether we agree with it."). *Abbott Building* is directly on point here because the court there found that even if "the statute would still immunize the [agency] from claims that it had acted in an 'improper manner,'" Treasury Reply 13, that statute did not bar claims against others.

FHFA did not have the authority to enter into the Sweep Amendment without Treasury's

consent, an order declaring that Treasury lacked authority to execute the Sweep Amendment

would have the same effect as if Treasury had not agreed to the Sweep Amendment at all.  FHFA

remains free to sell or transfer assets, or to take a host of other actions, consistent with its

conservatorship responsibilities.  The jurisdictional limitation on suits that "restrain or affect"

FHFA's "exercise" of its "powers or functions" as conservator therefore has no application to

Plaintiffs' claims against Treasury.  *See* APA Br. 29-31.

Treasury responds with a list of cases that invoke the jurisdictional provision when

equitable relief against a third party "is simply another way of restraining the conservator."

Treasury Reply 12-13.  But as Treasury recognizes, these cases involve attempts to limit a

conservator's powers or functions without suing the conservator directly—either by obtaining an

injunction that would bind the conservator or by prospectively removing a particular power from

the conservator.  *See, e.g.*, *Dittmer Props., L.P. v. FDIC*, 708 F.3d 1011, 1018 (8th Cir. 2013)

(suit against a third party to void note sold to it by the FDIC would have a "chilling effect upon

the receiver's ability to perform its statutory functions"); *see also Hindes v. FDIC*, 137 F.3d 148,

161 (3d Cir. 1998); *Telematics Int'l, Inc. v. NEMLC Leasing Corp.*, 967 F.2d 703, 707 (1st Cir.

1992); *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 674 F. Supp. 2d 483, 494 (S.D.N.Y. 2009);

*Furgatch v. RTC*, No. 93-20304, 1993 WL 149084, at *2 (N.D. Cal. Apr. 30, 1993).  Holding

that Treasury exceeded its authority will have no such effect on FHFA.[11]

---

[11]  Treasury also cites *In re Federal Home Loan Mortgage Corp. Derivative Litigation*, 643 F. Supp. 2d 790 (E.D. Va. 2009), which has nothing to do with whether equitable relief against a third party restrains or affects the conservator's powers or functions.  Treasury Reply 12.  In that case, FHFA moved to substitute itself as plaintiff in a shareholder derivative suit for damages.  *See* 643 F. Supp. 2d at 793-94.  The court, supplementing its main holding that FHFA has the right to control derivative suits absent a conflict of interest, stated that denying FHFA's motion would also violate Section 4617(f), because in moving to substitute FHFA was "acting well within its statutory authority under HERA."  *Id.* at 798-99.  It was thus FHFA's own motion to substitute—not the derivative suit against third parties—that brought Section 4617(f) into play.

Notably, Treasury is unable to cite a single case in which a court applied Section 4617(f) or its FIRREA analogue to hold that dealing with a conservator or receiver immunizes a third party from its independent legal obligations. *Dittmer*, *Telematics*, and *Furgatch* concerned the rights and obligations tied to ownership of assets originally held by banks in receivership or conservatorship. *Dittmer*, 708 F.3d at 1014-15; *Telematics*, 967 F.2d at 707; *Furgatch*, 1993 WL 149084, at *1. *Hindes* was a challenge to the FDIC's authority to place a bank in receivership and sell its assets. 137 F.3d at 154. And *Kuriakose* addressed the enforceability of Freddie Mac's employee severance contracts. 674 F. Supp. 2d at 486. In each case, the plaintiff's claim turned on the legal obligations of the receiver/conservator or its ward—not the independent legal obligations of the particular third parties the plaintiffs sought to enjoin. Here, in contrast, Plaintiffs' APA claims against Treasury have nothing to do with the legal duties of FHFA or the Companies; even if FHFA's conduct were lawful, that would not make Treasury's decision to enter into the Sweep Amendment any less arbitrary and contrary to *Treasury's* authority under HERA. Just as HERA's jurisdictional provision would not prevent a court from enjoining one of the Companies' underwriters from violating its independent duties under the federal securities laws, it does not prevent this Court from ordering Treasury to comply with the APA.

Moreover, none of Treasury's authorities purport to immunize *other federal agencies*. Treasury sees no distinction and instead urges this Court to articulate a rule that would permit any agency to violate the law, so long as it did so in conjunction with FHFA. *See* Treasury Reply 11-15; *see also* APA Br. 29-31. But "there is a well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action, and [courts] will accordingly find an intent to preclude such review only if presented with clear and convincing evidence." *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 63-64 (1993) (citations and internal

quotation marks omitted).  Section 4617(f) is utterly devoid of any evidence—let alone "clear and convincing evidence"—that Congress intended to preclude review of *Treasury's* actions. *See, e.g.*, *Stommel v. LNV Corp.*, No. 2:13CV821DAK, 2014 WL 1340676, at *5 (D. Utah Apr. 4, 2014) (refusing to apply FIRREA's anti-injunction provision to insulate actions of third party from judicial review); *LNV Corp. v. Outsource Serv. Mgmt., LLC*, No. 13-cv-1926, 2014 WL 834977, at *4 (D. Minn. Mar. 4, 2014) (same).

Treasury also argues that the phrase "affect the exercise of powers or functions of [FHFA]" is broad enough to preclude Plaintiffs' APA claims against Treasury.  Treasury Reply 12.  This cannot be the law.  Under Treasury's reasoning, equitable relief would be unavailable in broad swaths of lawsuits between private parties—from securities fraud suits about mortgage-backed securities bundled by Fannie Mae to foreclosures on homes with mortgages owned by Freddie Mac—because, through an elaborate and speculative causal chain, they might "affect" FHFA.  This is far from a "rhetorical exercise."  Treasury Reply 14-15.  Receivers have asserted the jurisdictional provision in such situations—and have been rightly rebuffed.  *See, e.g.*, *Birdville Indep. Sch. Dist. v. Hurst Assocs.*, 806 F. Supp. 122, 128 (N.D. Tex. 1992) ("The RTC argues that [Section 1821(j)] show[s] Congress's intent that taxing authorities not be allowed to foreclose on mortgage interests held by the RTC as receiver, since foreclosure would interfere with the RTC's power to conserve and preserve the assets it acquires from failed institutions. The Court believes, however, that the RTC reads more into [Section 1821(j)] than was intended.").  The plain language of Section 4617(f) and case law interpreting it thus foreclose Treasury's argument.

*  *  *

Accordingly, this Court has jurisdiction over Plaintiffs' APA claims and can address the merits.

## II.     The Sweep Amendment Exceeded Treasury's Authority Under HERA.

### A.     Treasury Did Not Exercise Any Right Received In Connection With Its Prior Purchase Of The Companies' Securities When It Executed The Sweep Amendment.

After December 31, 2009, Treasury's authority with respect to the Companies' securities or obligations was limited to its power to "hold, exercise any rights received in connection with, or sell, any obligations or securities purchased." 12 U.S.C. § 1719(g)(2)(D). Treasury agrees, Treasury Reply 26-27, but argues that the Sweep Amendment was an exercise of its "right" under Section 6.3 of the Purchase Agreements, which provides that the "Agreement may be waived or amended solely by a writing executed by both parties hereto," Treasury 0027-0028.

Treasury is mistaken. A party possesses a "right" when that right can be "exercised" unilaterally, such that the right holder "can initiate legal proceedings that will result in coercing" the counterparty to do the promised act. 1 E. Allan Farnsworth, *Farnsworth on Contracts* § 3.4 at 205 n.3 (3d ed. 2004); *see* APA Br. 38. Treasury received several such rights in the Purchase Agreements, as Treasury explained in recent briefing before the Southern District of Iowa: "Treasury's rights under the [Purchase Agreements included] its receipt of senior preferred stock with accompanying dividend rights, warrants to purchase common stock, and the right to set commitment fees." *See* Dep't of Treasury's Mem. in Supp. of Mot. to Dismiss 9, *Continental W. Ins. Co. v. FHFA*, No. 14-cv-42-RP-RAW (S.D. Iowa Apr. 29, 2014). Each of these actions could be undertaken unilaterally by Treasury and did not require FHFA's consent or additional consideration. In contrast, Treasury's supposed "right" to amend the Agreements is no "right" at all, as its "exercise" requires FHFA's consent to the new agreement. *See United States v. Petty*

*Motor Co.*, 327 U.S. 372, 380 n.9 (1946) (noting that an agreement that depends on the subsequent "mutual consent" of the parties "does not add to their rights").[12]

Attempting to respond to this argument, Treasury states that "parties can possess 'rights' that are exercised mutually," as opposed to unilaterally, citing dicta about the "right to contract." Treasury Reply 27.  Treasury misses the point, as the "right to contract" is not a right that Treasury "*received* in connection with" its purchase of the Treasury Stock.  This "right to contract"—and the associated right to amend a contract—is merely a background principle possessed by all natural persons and business associations.  *See* 11 *Williston on Contracts* § 31:5 (4th ed. 2014).  With regard to the Companies, Treasury acquired this "right to contract" the day HERA became law and granted it the authority to purchase securities or obligations from the Companies.  12 U.S.C. § 1719(g)(1)(A).  Stating that Treasury and FHFA could amend the Agreements by mutual consent thus did not add to (or subtract from) the bundle of rights Treasury possessed prior to executing the Purchase Agreements.  Section 6.3's recognition of the "right to amend" was thus not a "right" Treasury "received" that could be exercised after December 31, 2009.

Treasury suggests that, even if this Court concludes that the Sweep Amendment was not an exercise of any right, that to vacate the Sweep Amendment this Court must *also* find that it was a "purchase" of securities.  Treasury Reply 29.  Not so.  Although Plaintiffs also argue that the Sweep Amendment constituted a purchase of securities, if this Court concludes that the

---

[12]  Treasury argues that the statement in *Petty Motor Co.* regarding "mutual consent" restated a legal principle unique to interests in land, inapplicable to the present case.  Treasury Reply 28.  Treasury is again mistaken.  That case concerned the government's taking of leasehold interests in land; the Court held that the government must compensate the leaseholders "for any remainder of its term which existed after its ouster"—in other words, the leaseholders' "rights" in the land.  327 U.S. at 380.  The Court rejected the leaseholders' argument that they should be compensated for time beyond that indicated in their leases because "some tenants had occupied their leaseholds by mutual consent for longer periods" than provided for by the lease, because that "mutual consent" did not "add to their rights" under the written leases.  *Id.* at 380 n.9.  So, too, with the Purchase Agreements.

Sweep Amendment was not an exercise of any right Treasury *received in connection with* its

purchases of the Companies' securities, then Treasury exceeded its authority under HERA in

violation of the APA, and the unlawful agency action must be set aside.

**B.      The Sweep Amendment Was A Purchase Of The Companies' Securities Or Obligations.**

The Sweep Amendment also exceeded Treasury's authority under HERA because it

constituted a purchase of the Companies' "obligations or securities" after December 31, 2009.

That the Sweep Amendment constitutes a "purchase" is confirmed by:  (1) the ordinary meaning

of the term "purchase"; (2) the securities laws' fundamental change doctrine; and (3) Treasury's

own regulations.  Treasury disagrees, claiming that the Sweep Amendment is a mere

modification of the terms of its stock.  But it does not ever explain how something that has netted

an additional *$130 billion* in 18 months seriously could be considered a mere "modification."

*Cf. MCI Telecomms. Corp v. AT&T*, 512 U.S. 218, 228 (1994) ("'Modify' . . . connotes moderate

change.").  The modification "mousehole" cannot hide a $130 billion "elephant."  *Whitman v.*

*Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

1.      The Sweep Amendment was a "purchase" of "obligations" under those terms'

ordinary meanings.  Treasury itself defines purchase to mean "to acquire in exchange for

payment in money or an equivalent; to buy," Treasury Opening Br. 38, the Uniform Commercial

Code defines that term as "taking by sale, lease, discount, negotiation, mortgage, pledge, lien,

security interest, issue or reissue, gift or *any other voluntary transaction creating an interest in*

*property*," U.C.C. § 1-201 (emphasis added), and *Black's Law Dictionary* defines the related

term, "purchaser," to mean "one who obtains property for money or other valuable

consideration," *Black's Law Dictionary* 1355 (9th ed. 2009).  FHFA cannot dispute that the

Sweep Amendment falls within these definitions, as it argued that the Sweep Amendment

"transfer[red] an Enterprise asset—potential future profits—to Treasury in exchange for relief from an obligation—10% dividends." FHFA Opening Br. 27.[13]

Treasury tries simultaneously to defend the dubious premise that the Sweep Amendment was an arm's length transaction with FHFA, and to argue that the Sweep Amendment was not a "purchase" because Treasury did not "commit any additional funds" and Treasury did not receive "any additional shares of [Treasury] Stock," Treasury Reply 29, implicitly challenging the notion that the Sweep Amendment involved valuable consideration.  Again, FHFA appears to disagree, as it justifies the Sweep Amendment as a transfer of "an Enterprise asset"—the obligation to remit all the Companies' net worth—which FHFA presumably considers valuable. *See* FHFA Opening Br. 27.  Treasury's argument also ignores the fact that in-kind "share exchanges"—transactions that change a party's rights—are purchases even if money does not change hands.  *See SEC v. Nat'l Sec. Inc.*, 393 U.S. 453, 467 (1969).  And Treasury's argument is inconsistent with the December 2009 Second Amendment to the Purchase Agreements, where Treasury explained that it was exercising its "purchase authority," to "modify the Treasury's funding commitment" *and* "amend the terms of the [Purchase] Agreements."  Treasury 0187-0188.  In other words, Treasury itself acknowledged that "amending the terms of the [Purchase] Agreements" was a "purchase" under HERA, even though that aspect of the Second Amendment required neither the issuance of new stock nor the commitment of additional funds.[14]

---

[13]  In an attempt to argue that its rights under the Purchase Agreements were not valuable consideration, Treasury suggests that "nothing in either [Purchase Agreement] allows Treasury to sell off its entitlement to various forms of compensation."  Treasury Reply 31.  Treasury is mistaken.  HERA grants Treasury authority "at any time" to "sell any obligation or security" it purchased.  12 U.S.C. § 1719(g)(2)(B).

[14]  Treasury argues that the contractual rights—to fixed dividends and other payments—that Treasury sold back to the Companies cannot be viewed as "equivalent to cash" because there is no "market of buyers who can pay the net present value of a commitment fee on a $445 billion capital facility."  Treasury Reply 31.  Yet that a market is small hardly means an asset cannot be valued.  Treasury apparently valued the Periodic Commitment Fee at approximately the difference between the Net Worth Sweep and a fixed 10 percent dividend, minus the potential value of its

*(Cont'd on next page)*

2.     The Sweep Amendment was also a purchase under the "fundamental change" doctrine, which treats amendments to securities as purchases for purposes of suits under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), if the amendment causes "such a significant change in the nature of the investment or in the investment risks as to amount to a new investment." *Gelles v. TDA Indus., Inc.*, 44 F.3d 102, 104 (2d Cir. 1994); *see also* APA Br. 42.  The Sweep Amendment wrought such a change:  it transformed the fixed-dividend Treasury Stock worth $19 billion per year into a variable sweep of the Companies' entire net worth, which netted Treasury $130 billion in 2013 alone.  Unable to deny the significance of the $111 billion change, Treasury attacks the doctrine, but its arguments fall short.

Treasury first argues that the "fundamental change" doctrine—also referred to as the "forced sale doctrine"—states only an exception to the traditional limitation that only willing purchasers or sellers of securities have standing to bring claims under Section 10(b), rather than addressing when a transaction is a "purchase."  Treasury Reply 32.  Treasury is mistaken.  As explained in Treasury's leading citation, *Jacobson v. AEG Capital Corp.*, 50 F.3d 1493 (9th Cir. 1995):  "The forced sale doctrine provides a cause of action under the securities laws to plaintiffs who are forced to convert their shares for money or other consideration, or forced to fundamentally change the nature of [their] investments."  *Id.* at 1498; *see also 7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 227 (5th Cir. 1994) ("[I]nvestor whose shares in one company were converted into shares in another under a merger agreement effectively 'sold' his shares in the former and 'purchased' shares in the latter." (citing *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 591 (5th Cir. 1974)))).  The doctrine thus establishes,

_____

*(Cont'd from previous page)*

warrants on 80 percent of the Companies' common stock (rendered valueless by the Administration's determination to liquidate the Companies).

according to another case cited by Treasury, when a transaction is viewed as an "actual sale" (the other side of which, of course, is a purchase) for purposes of the securities laws. *See Murphey v. Hillwood Villa Assocs.*, 411 F. Supp. 287, 292 (S.D.N.Y. 1976).

Treasury next argues that the fundamental change doctrine cannot inform the meaning of the word "purchase" in HERA because there is some disagreement among courts over application of the doctrine. Treasury Reply 32. But Treasury overstates the disagreement and its importance. First, *only* the Seventh Circuit has rejected the doctrine in the context of Section 10(b). *See Isquith by Isquith v. Caremark Int'l, Inc.*, 136 F.3d 531, 535 (7th Cir. 1998); *see also* Eric C. Chafee, *Standing Under Section 10(b) & Rule 10b-5: The Continued Validity of the Forced Seller Exception to the Purchaser-Seller Requirement*, 11 U. Pa. J. Bus. L. 843, 875-76 (2009).[15] Second, the Seventh Circuit's decision not to apply the doctrine had nothing to do with whether a fundamental change can constitute a "purchase" of new securities, but rather concerned whether a spinoff constituted a "forced" purchase such that stockholders never relied on a false statement. *See Isquith*, 136 F.3 at 534. More to the point, the D.C. Circuit has discussed the doctrine with approval. *See Sacks v. Reynolds Sec., Inc.*, 593 F.2d 1234, 1240 (D.C. Cir. 1978); *see also Houlihan v. Anderson-Stokes, Inc.*, 434 F. Supp. 1330, 1337-39 (D.D.C. 1977). And so has the Second Circuit, a fact that Treasury's own authority explains is "significant because th[at] circuit is the 'Mother Court' of the purchaser-seller requirement." Chafee, *supra*, at 862-63.

---

[15] The Tenth Circuit case Treasury cites declined to apply the fundamental change doctrine in the context of a claim under Section 12 of the Securities Act of 1933, which has a different and more restrictive purchaser requirement than Section 10(b). *See Katz v. Gerardi*, 655 F.3d 1212, 1221 (10th Cir. 2011). *Compare* Section 12 (seller is liable only "to the person purchasing such a security from him"), *with* Section 10(b) (liability "in connection with the purchase or sale of any security").

Treasury also contends that the fundamental change doctrine is inapplicable because "[c]ourts apply [that] doctrine in order to protect the investor on the other end of that involuntary change," and Treasury was not an involuntary purchaser. Treasury Reply 34. But even assuming that Treasury was a willing participant in this transaction, it is not clear that FHFA, acting on behalf of the Companies as conservator, was (or should have been) also willing. In any event, Treasury cites no authority suggesting that the fundamental change doctrine cannot, or should not, be applied in this context. Indeed, it should because statutory limits on agency authority exist not to aggrandize executive agencies, but rather to protect citizens from agency overreach. *See Loving v. IRS*, 742 F.3d 1013, 1022 (D.C. Cir. 2014) ("[T]he fox-in-the-henhouse syndrome is to be avoided by taking seriously, and applying rigorously, in all cases, statutory limits on agencies' authority." (citation omitted)).

3.      Similarly, Treasury's own taxation regulations consider significant modifications to a debt security to be a sale—or, in the parlance of the Internal Revenue Service, an "exchange"—of that security. *See* 26 C.F.R. § 1.1001-3(b). The Sweep Amendment clearly satisfies this test, as the more than 600 percent increase in the value of Treasury's dividend (from $19 billion per year to $130 billion) far exceeds the yield difference triggering an "exchange" under the regulations, *see id.* § 1.1001-3(e)(2)(ii) ("the greater of (A) ¼ of one percent (25 basis points); or (B) 5 percent of the annual yield of the unmodified instrument"), and has effectively changed the Treasury Stock from a debt-like, fixed-income security into one with the characteristics of common stock, *see id.* § 1.1001-3(e)(5)(i) ("A modification of a debt instrument that results in an instrument . . . that is not debt . . . is a significant modification.").

Treasury's arguments to the contrary fail. First, it argues that these regulations do not apply to preferred stock, *see* Treasury Reply 37, but that is simply wrong. The regulation's text

does not exclude preferred stock.  And the IRS *does* apply these principles to preferred stock. *See* IRS, Action on Decision 3 (IRB No. 2013-32 Aug. 5, 2013) (explaining the IRS's belief that a "forbearance agreement" with "preferred shareholders" was "a significant enough modification to constitute a deemed exchange" under "Treas. Reg. § 1.1001-3"), http://www.irs.gov/pub/irs-aod/AOD%202012-08.pdf.

Second, Treasury claims that this Court should ignore the six-fold increase Treasury reaped from the sale, because Treasury did not expect such a return at the time.  Treasury Reply 37.  Again, even if one accepts this representation at face value, Treasury's own analysis showed that the Sweep Amendment would, in all but one forecast scenario, yield larger payments to Treasury.  *See* Treasury 3888 (larger payments under two "stress cases"); *id.* at 3862 ("In certain positive scenarios (not modeled), the proceeds recaptured by Treasury might be higher.").

Third, Treasury argues that the pre-Sweep Amendment Purchase Agreements were already variable-rate instruments because Treasury could have set the Periodic Commitment Fee "with reference to the market value of the Commitment," Treasury Reply 36, apparently a reference to FHFA's newly-minted argument that the "market value" of the Periodic Commitment Fee was "incalculably large," FHFA Reply 53.  Treasury errs.  Commitment fees in loan agreements are generally fixed-rate instruments "calculated at x percent per annum on the principal amount" of the untapped portion of the loan commitment.  IRS Rev. Rul. 81-160 (June 8, 1981), *available at* http://www.charitableplanning.com/document/676176; *see also* Sandra S. Stern, *Structuring & Drafting Comm. Loan Agreements* ¶ 1.05[2][A] ("The fee is usually based on the average daily unused portion of the revolving credit commitment.").  Thus, if Treasury were to exercise its "reasonable discretion" to set the Fee, *see* Treasury 0100 (§ 3.2(b)), and refer to the "market" understanding of how commitment fees are set, it could not set the Periodic

Commitment Fee equal to the Companies' net worth.  Perhaps that is why Treasury apparently abandoned that very proposal in 2011.  *Compare* Treasury 0202 (December 2010 memorandum proposing to "set the [Fee] equal to any generated positive net income"), *with* Treasury 2358-2359 (December 2011 memorandum omitting a similar recommendation).[16]

In sum, executing the Sweep Amendment was not the exercise of any right received in connection with securities, and the Sweep Amendment also constituted the purchase of securities.  In either case, Treasury lacked authority to execute it, and it should be vacated.

## III.   FHFA's Conduct Violates The APA.

### A.   FHFA's Failure To Compile An Administrative Record Deprives This Court Of A Basis To Uphold The Sweep Amendment.

Separately, this Court cannot uphold the Sweep Amendment as within FHFA's statutory authority because FHFA has not submitted an administrative record explaining its decisionmaking process.  The APA's requirement that review of agency action be on the "whole record," 5 U.S.C. § 706, applies not only to arbitrary-and-capricious review, but also to whether an agency "acted within the scope of [its] authority."  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971).  FHFA has refused to compile or file an administrative record in this case, despite its tacit concession that it was required to do so by the Federal Records Act.  *Compare* APA Br. 47-48, *with* FHFA Reply 52-53.  It instead submitted a "Document Compilation" with cherry-picked documents and a declaration created for this litigation that FHFA self-servingly contends "reflect[] the considerations that FHFA as Conservator took into account in executing the [Sweep] Amendment."  FHFA Reply 52; *see also* Dkt. No. 27, at 2.

---

[16]   Moreover, Treasury's suggestion that the Periodic Commitment Fee could lawfully have been set at the Companies' net worth is meritless.  The Fee could only be set by mutual agreement between Treasury and FHFA, Treasury 0022 (§ 3.2(b)), and FHFA could no more use that provision as an excuse to give away the Companies' net worth than it could through the Sweep Amendment.  *See* APA Br. 70-71.

This submission is not an administrative record.  *See* APA Br. 46-51.  When the APA says the "whole record," that means, "neither more nor less than what was before the agency at the time it made its decision."  *Marcum v. Salazar*, 751 F. Supp. 2d 74, 78 (D.D.C. 2010).

FHFA tries to shift the burden to Plaintiffs, saying *they* have failed to overcome the "strong presumption of regularity" for FHFA's Document Compilation.  FHFA Reply 53.  But "[i]t is the agency's responsibility to compile" an administrative record in the first instance.  *Marcum*, 751 F. Supp. 2d at 78.  Only after the agency submits an administrative record can the "presumption of regularity" apply.  *See id.*  Here, however, FHFA admits that it never created an administrative record.  *See* Dkt. No. 27, at 2 ("Defendants FHFA and DeMarco are not required to—*and have not*—created or maintained an administrative record relating to the execution of the Third Amendment." (emphasis added)).  No presumption of agency "regularity" can make the Court pretend that a "document compilation" is an administrative record, when the Agency admits that no such record exists.  *See Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 600 (D.C. Cir. 2007) ("If the [agency's] documents fail to demonstrate the reasonableness of its decision, it means that the agency either has chosen not to write down the reasons for its decision or is unable to do so.  Neither possibility is acceptable under the [APA].").

Perhaps recognizing the weakness of its position, FHFA belatedly claims that its Document Compilation includes "the materials which were before it and were directly or indirectly considered."  FHFA Reply 52 (citation omitted); *see also* FHFA Discovery Opp. 29.  This claim is implausible on its face given that it contradicts FHFA's prior representations that it neither "created [nor] maintained an administrative record relating to the execution of the Third Amendment," Dkt. 27, at 2, and given that the Document Compilation contains not a single internal FHFA document memorializing the agency's independent assessment of the Sweep

27

Amendment, APA Br. 49-50.  FHFA makes no effort to explain the obvious gaps in its

Document Compilation, and its silence underscores the fact that it has not satisfied its obligation

to produce a complete administrative record.

FHFA is wrong to suggest that the Ugoletti Declaration—its only attempt to explain its

rationales and conclusions—is anything other than a *post hoc* rationalization of its actions.

FHFA Reply 53.  FHFA contends that the "'*post hoc* rationalization rule' is not a time barrier

which freezes an agency's exercise of its judgment after an initial decision has been made . . .

[to] bar [the agency] from *further articulation* of its reasoning," *id.* (quoting *Menkes v. U.S.

Dep't of Homeland Sec.*, 637 F.3d 319, 337 (D.C. Cir. 2011) (emphasis added)), but the

additional "exercise of [the agency's] judgment" the Court allowed in *Menkes* occurred on

remand to the agency following vacatur of its original decision, *see* 637 F.3d at 335-37; *see also

Menkes v. Dep't of Homeland Sec.*, 486 F.3d 1307, 1315 (D.C. Cir. 2007).  Nothing in *Menkes* or

any other D.C. Circuit case suggests that, while an administrative decision is before the Court,

the agency may supplement its rationale with additional arguments it has not previously

considered.  To be sure, "there is nothing improper in receiving declarations that merely

illuminate reasons obscured but implicit in the administrative record."  *Clifford v. Peña*, 77 F.3d

1414, 1418 (D.C. Cir. 1996) (citation omitted).  But the Ugoletti Declaration here is not a *further*

articulation of FHFA's reasoning; it is the *only* articulation.  And a declaration written in light of

Plaintiffs' APA claims surely cannot fulfill FHFA's obligation to produce "neither more nor less

than what was before" it when it decided to enter into the Sweep Amendment.  *See Marcum*, 751

F. Supp. 2d at 78; *Consumer Fed'n of Am. & Pub. Citizen v. U.S. Dep't of Health & Human

Servs.*, 83 F.3d 1497, 1506-07 (D.C. Cir. 1996) (refusing to consider rationalization offered in

declaration by agency official not contained in administrative record).  FHFA has failed to

provide a record sufficient to evaluate the legality of its actions and, for that reason alone,

summary judgment should be awarded to Plaintiffs on their APA claims against FHFA.[17]

> **B.** **FHFA Violated the APA By Acting In Excess Of Its Statutory Authority As Conservator.**
>
> > **1.** **The Sweep Amendment Is Inconsistent With FHFA's Conservatorship Obligations.**

FHFA's decision to execute the Sweep Amendment exceeded its authority as the

Companies' conservator.  Congress requires FHFA, when acting in this capacity, to "preserve

and conserve" the Companies' assets and place the Companies in "a sound and solvent

condition," 12 U.S.C. § 4617(b)(2)(D), which FHFA itself has explained is intended to "return[]

the entities to normal business operations," FHFA 0016, and prohibits capital distributions that

"deplete the entity's conservatorship assets," 76 Fed. Reg. 35,724, 35,727 (June 20, 2011).

Indeed, only months before announcing the Sweep Amendment, FHFA acknowledged that as

conservator it "has a statutory responsibility to ensure each [Company] 'operates in a safe and

sound manner.'"  FHFA 2688 (Feb. 21, 2012).

These goals are consistent with the well-established understanding of a conservator's

role.  As Plaintiffs explained in their opening brief, conservatorships operate with the

longstanding assumption that the entity "might someday be rehabilitated."  *See* APA Br. 52-55

(quoting *Del E. Webb McQueen Dev. Corp v. RTC*, 69 F.3d 355, 361 (9th Cir. 1995)); *see also*

*McAllister v. RTC*, 201 F.3d 570, 579 (5th Cir. 2007) ("[A] conservator only has the power to

---

[17]  Plaintiffs note that there is pending before the Court a motion to supplement the administrative record and to take discovery concerning the completeness of the administrative record.  *See* Dkt. No. 31, No. 13-cv-1053.  And, in parallel litigation in connection with the Sweep Amendment, jurisdictional discovery now is ongoing.  *See* Order, *Fairholme Funds, Inc. v. United States*, No. 13-465 C (Fed. Cl. Apr. 4, 2014) (setting discovery schedule). Plaintiffs believe that discovery will likely reveal documents that should have been—but were not—included in Treasury's administrative record and/or FHFA's "Document Compilation."  To the extent that such documents are discovered, Plaintiffs will seek to supplement the administrative record and may request the opportunity to file supplemental briefing to address these new documents and seek other appropriate relief for the agencies' failure to produce the appropriate administrative records.

take actions necessary to restore a financially troubled institution to solvency."). This stands in contrast to receivership, which "liquidate[s] an institution and wind[s] up its affairs" after the receiver "determin[es] . . . that the institution is not viable." *See* APA Br. 54 (quoting David H. Carpenter & M. Maureen Murphy, Cong. Res. Serv., RL34657, *Financial Institution Insolvency: Federal Authority over Fannie Mae, Freddie Mac, and Depository Institutions* 6 (2008)).

Against this backdrop, the Sweep Amendment clearly contravened FHFA's obligation to "preserve and conserve" the Companies' assets. The Sweep Amendment drains the Companies' capital, obligating them to hand over their net worth to Treasury every quarter—which has, in just 18 months, netted Treasury nearly *$158 billion*. This capital depletion was not unforeseen: Treasury explained that the Sweep Amendment's purpose was to "make sure that every dollar of earnings each firm generates is used to benefit taxpayers" and to prevent the Companies from "retain[ing] profits" or "rebuild[ing] capital." Dep't of Treasury, *Treasury Dep't Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac* (Aug. 17, 2012), http://www.treasury.gov/press-center/press-releases/Pages/tg1684.aspx. FHFA took this action to "wind down" the Companies, creating "[a] housing industry . . . without Fannie Mae and Freddie Mac," FHFA, *2012 Report to Congress* 13 (June 13, 2013), and to further the government's "commitment" to "ensure [that] existing common equity holders will not have access to any positive earnings from the [Companies]," Treasury 0202. The Sweep Amendment ensures that the Companies cannot resume "normal business operations," but will instead exist in a financial coma, waiting until FHFA pulls the plug. A conservator simply cannot act in this manner.

Indeed, at a more basic level, FHFA violated HERA and its conservatorship obligations by agreeing to the Sweep Amendment at Treasury's direction. *See* 12 U.S.C. § 4617(a)(7); APA

Br. 51.  FHFA's only answer is to characterize Plaintiffs' allegations as "conclusory."  FHFA

Reply 10-11.  Far from "conclusory," Plaintiffs have identified specific portions of the

Administrative Record showing that the Sweep Amendment was conceived and developed by

Treasury, with FHFA's Acting Director merely signing the paperwork.  *See* Treasury 3775-3802,

3833-3862, 3883-3894, 3895-3903 (Treasury presentations).

> **2.    The Agencies' Contentions That The Sweep Amendment Is Consistent With A Conservator's Powers Under HERA Are Meritless.**

a.     FHFA first contends that it lawfully executed the Sweep Amendment under its

power to transfer the Companies' assets.  *See* FHFA Reply 5-7; *see also* Treasury Reply 9-10.

FHFA goes further, arguing that the fact that the Sweep Amendment effects a transfer of assets is

"dispositive," even if that transfer is inconsistent with its conservatorship obligations to

"preserve and conserve" the Companies' assets.  FHFA Reply 6.  These arguments fail.

First, HERA itself makes clear that FHFA's power to transfer assets is predicated on

FHFA's legitimate exercise of its conservatorship authority.  The statute provides that FHFA

"may, *as conservator or receiver*, transfer or sell any asset or liability of the regulated entity in

default."  12 U.S.C. § 4617(b)(2)(G) (emphasis added).  Any transfer of assets by FHFA must be

done "as conservator."  *Id.*  Accordingly, courts must first inquire as to whether the act in

question is within the conservator or receiver's authority, and then ask whether the act is also

appropriate under an additional authority, such as the asset transfer provision.  *See Freeman v.

FDIC*, 56 F.3d 1394, 1398 (D.C. Cir. 1995) ("In the present case, the FDIC is unquestionably

acting in its capacity as 'receiver,' *and as such* is authorized by statute to exercise 'all rights,

titles, powers, and privileges of the insured depository institution . . . with respect to . . . the

assets of the institution,'" including the power to "'transfer any asset or liability of the

institution.'" (emphasis added)).

31

Second, FHFA's argument would permit it to disregard any distinction between a conservator and a receiver.  HERA makes clear that *only* receivers have the authority to liquidate the Companies.  *See* 12 U.S.C. § 4617(b)(2)(E).  But, if FHFA's argument is correct—that FHFA as conservator can do whatever it likes as long as that action can be characterized as a transfer of assets—then FHFA as conservator could liquidate the companies, as a liquidation is essentially a massive "transfer or sale" of assets.  *See Black's Law Dictionary* 1015 (9th ed. 2009) (liquidation, *n.*: "The act or process of converting assets into cash, esp. to settle debts."); *Freeman*, 56 F.3d at 1401 (explaining that liquidation "ensure[s] that the assets of [the Companies] are distributed").  Of course, FHFA admits—as it must—that a conservator has no authority to liquidate.  *See* FHFA Opening Br. 30-31.  This concession destroys FHFA's argument that the fact that an asset was transferred is "dispositive" of whether FHFA was acting within its conservatorship authority.  FHFA Reply 6.  Context clearly matters:  an appropriate action for a receiver may be wholly inappropriate for a conservator.  In any event, no conservator could lawfully execute the Sweep Amendment.

The folly of FHFA's argument that every transfer is within the conservator's authority is made clear by its invocation of *RTC v. CedarMinn Building Ltd. Partnership*, 956 F.2d 1446 (8th Cir. 1992).  FHFA suggests that, according to *CedarMinn*, powers given both to conservators and receivers grant identical authority.  *See* FHFA Reply 13.  But the case in fact says exactly the opposite—that conservators and receivers have conflicting missions, and so they must exercise even shared statutory powers (in that case, the power to repudiate contracts) in different ways:

> This distinction in the roles between conservator and receiver is not only recognized historically, but is practical as well, particularly as it pertains to the repudiation strategy of a conservator and receiver.  The conservator's mission is to conduct an institution as an ongoing business.  In that light, the strategic decision whether or not to repudiate a lease—particularly when the institution is operating a consumer enterprise from the leased premises—stands apart from the

> strategy of a receiver, whose interest, by definition, is shutting the business down. A conservator needs an open door; a receiver does not.

956 F.2d at 1454.  As *CedarMinn* thus makes clear, each statutory power must be construed in light of the capacity in which FHFA acts.

FHFA and Treasury try to evade this point by citing cases in which a receiver's sale of an individual asset or group of assets was challenged.  FHFA Reply 7; Treasury Reply 9.  Of course, cases involving a *receiver's* sale of a single asset have little bearing on whether a *conservator* may transfer all of a company's future profits in perpetuity, because "future income flows" represent a company's "fundamental value."  *See Tenn. Gas Pipeline Co. v. FERC*, 926 F.2d 1206, 1208 n.2 (D.C. Cir. 1991).  Indeed, one of FHFA's own citations concedes that the key inquiry is whether "'FHFA's decision is in furtherance of the conservation and preservation of the Enterprises' assets.'"  FHFA Reply 7 (quoting *Cnty. of Sonoma v. FHFA*, 710 F.3d 987, 994 (9th Cir. 2013)).  The Sweep Amendment plainly fails that test.

b.      FHFA claims that the Sweep Amendment was within its statutory authority to take actions in the "best interests of the [Companies] or [FHFA]" and to "carry on the business" of the Companies.  FHFA Reply 7 (quoting 12 U.S.C. § 4617(b)(2)(D), (J)(ii)).  FHFA does not muster any support for this stunning proposition that it can disregard its conservatorship obligations if it, in its sole discretion, concludes that an action may benefit the Companies, or even itself.  That is not the law, and "FHFA cannot evade judicial scrutiny by merely labeling its actions with a conservator stamp."  *Leon Cnty. v. FHFA*, 700 F.3d 1273, 1278 (11th Cir. 2012).

Perhaps realizing the audacity of its contention, FHFA steps back, and instead offers the milder justification that the Sweep Amendment solved the "harmful" "practice of drawing funds *from* Treasury to pay dividends *to* Treasury"—the supposed "downward spiral."  FHFA Reply 8.

This "downward spiral" argument, however, is a made-for-litigation fabrication that could never justify the Sweep Amendment under the APA.  *See* APA Br. 66-70; Supp. Br. 4-5.

The downward spiral was entirely of FHFA's own making, as it had the option to pay Treasury's dividends in kind, rather than in cash, by increasing Treasury's liquidation preference.  *See* Treasury 0033.  Treasury argues that this option was not available because, had FHFA chosen this course, the applicable dividend rate would have been 12 percent, rather than 10 percent, which Treasury characterizes as a "failure," suggesting that FHFA could not choose that option.  Treasury Reply 49; *see also* FHFA Reply 55.  Treasury is mistaken:  as the Congressional Research Service recognized one week before the agencies executed the Sweep Amendment, the Purchase Agreements permit the Companies to "pay a 12 percent annual senior preferred stock dividend [in kind] indefinitely."  N. Eric Weiss, Cong. Research Serv., RL34661, *Fannie Mae's and Freddie Mac's Financial Problems*, at *i* (Aug. 10, 2012), *available at* http://www.fas.org/sgp/crs/misc/RL34661.pdf.  In addition to its tired and erroneous refrain that judicial review questions "the wisdom" of its actions, rather than its statutory authority, FHFA also makes the puzzling argument that "[f]ailing to meet the 10 percent dividend obligation risked undermining this message [that the Companies could meet their obligations] and fostering further market concerns about the creditworthiness of the [Companies]."  FHFA Reply 56.  This nonsensical statement cannot be true, as it implies that the market was "reassured" by FHFA's decision to have the Companies unnecessarily borrow from Treasury to pay Treasury, reducing the amount that the Companies could tap to pay *other* creditors.[18]

---

[18]  FHFA's decision to require the Companies to borrow money to pay Treasury's cash dividend also cannot be squared with corporate practice.  "A corporation cannot borrow money for the purposes of paying dividends in the absence of assets to offset the indebtedness."  11 *Fletcher Cyclopedia*, *supra*, § 5342.  Because the Companies borrowed money from Treasury only where their net worth dropped below zero—the Companies thus lacked "assets to offset" their draws from Treasury—FHFA's cash dividend payments were clearly improper.

FHFA also contends that Plaintiffs "overreach[]" by questioning whether FHFA actually considered the Companies' statements in corporate filings that they might have difficulty paying the 10 percent cash dividend. FHFA Reply 10. But because FHFA declined to produce or compile an administrative record, FHFA has not provided contemporaneous evidence that it considered the Companies' filings, or any document for that matter. Moreover, the Companies' carefully worded disclosures—made under FHFA's supervision—conflict with the evidence: Treasury's presentations showed that, even under "downside" scenarios, Freddie Mac would have more than $100 billion remaining in its commitment by 2023, Treasury 3850; and Fannie Mae had $64.1 billion in deferred tax assets that could offset years of Treasury dividends, Treasury 2705. Plaintiffs thus have ample reason to ask whether the Companies' filings accurately reflected the state of their business and whether FHFA considered those filings.

c.      FHFA finally argues that, as the Companies' conservator, it has authority to wind them up "to prepare them for potential liquidation." FHFA Reply 11. FHFA is wrong. As this Court has explained, permitting a conservator to act "as if it were shutting the business down" places the conservator in an "untenable position." *MBIA Ins. Corp. v. FDIC*, 816 F. Supp. 2d 81, 96-97 (D.D.C. 2011).[19] As a conservator, it is required to operate the Companies with the aim of rehabilitation or, as FHFA put it, to restore them to "normal business operations." *See supra* pp. 29-30; APA Br. 59-63. It acknowledges that, as conservator, it cannot liquidate the Companies. FHFA Opening Br. 30-31; 12 U.S.C. § 4617(b)(2)(E). And, as Plaintiffs have explained, "liquidation" and "winding up" are synonyms in the context of financial regulation. APA Br. 60. Dictionaries—a far more trustworthy source than a party's litigation-inspired assertions—define

---

[19] Treasury notes that the court ultimately concluded that MBIA's claims failed to clear FIRREA's jurisdictional provision. Treasury Reply 9. That fact is of little consequence. First, the case's ultimate disposition does not impact the persuasiveness of the district court's analysis of the line between conservator and receiver; and second, MBIA simply alleged that the FDIC incorrectly processed its claims. The legal claims here are very different.

"liquidation" and "winding up" as synonymous. *See Black's Law Dictionary*, *supra*, at 1738

("winding up, n. (1858) The process of settling accounts and liquidating assets in anticipation of

a partnership's or a corporation's dissolution"); *Oxford English Dictionary* Online (Dec. 2013)

("liquidation, n." defined as "[t]he action or process of winding up the affairs of a company").

When Congress enacts a statute using a "well-established term," courts presume that "Congress

intended the term to be construed in accordance with pre-existing . . . interpretations." *Bragdon*

*v. Abbott*, 524 U.S. 624, 631 (1998).  This Court should presume that Congress meant "winding

up"—and not "every step of winding up except the very last one"—when it used the term

"winding up."[20]

FHFA's efforts to parse the terms "liquidation" and "winding up" fall flat.  FHFA first

argues that whether "liquidate" and "wind up" are synonymous is irrelevant because the

Companies are still in existence.  FHFA Reply 13.  But liquidation is a process—involving the

disposition of all of an entity's assets—that occurs over time.  *See, e.g.*, *AmBase Corp. v. United*

*States*, 112 Fed. Cl. 179, 181-83 (2013) (documenting more than fifteen-year procedural history

of liquidation that followed after savings and loan company was placed into receivership); *Indep.*

*Petrochemical Corp. v. Aetna Cas. & Sur. Co.*, 672 F. Supp. 1, 6 (D.D.C. 1986).  Liquidation is

not necessarily accomplished by the flipping of a switch or filing of a declaration.  FHFA has

---

[20]  FHFA suggests that the RTC's conservatorship practice undermines Plaintiffs' understanding of a conservator's role.  *See* FHFA Reply 17 n.8.  But the RTC's practice has no similarity to FHFA's.  Under the RTC, a failed bank was never put directly into conservatorship.  Instead, the RTC was appointed *receiver*, in what was known as a "pass-through receivership."  A new legal entity was then created, and it took some assets and liabilities from the failed institution.  It was this new entity that was put into conservatorship.  *See FDIC v. United States*, 51 Fed. Cl. 265, 266-67 (2001); FDIC, *Managing the Crisis* 116-22 (1998); O.T.S. Gen. Couns. Mem. 92/RLD-6102 (Mar. 11, 1992), 1992 WL 12005212; *see also MBIA Ins. Corp. v. FDIC*, 708 F.3d 234, 238-39 (D.C. Cir. 2013) (explaining similar FDIC transaction after OTS closed IndyMac Bank); 74 Fed. Reg. 59,540 (Nov. 18, 2009) (same).  Since the failed institution had been put into receivership, it makes sense that the RTC was "downsiz[ing] and stabiliz[ing] the operations of the failed institutions."  *Managing the Crisis*, *supra*, at 216 n.9.

begun this process for the Companies by entering into the Sweep Amendment, disposing of their assets each quarter until they have none.  It cannot do so as a conservator.

FHFA argues that 12 U.S.C. § 4617(a)(2) grants it the authority to wind up the Companies *while acting as conservator* because the statute provides that FHFA may "be appointed conservator or receiver for the purpose of reorganizing, rehabilitating, or winding up the affairs of a regulated entity," FHFA Reply 12, and that "winding up includes prudential steps—short of liquidation—that can be taken by the Conservator to shrink the Enterprises' operations."  FHFA Opening Br. 14; *see also* Treasury Reply 10.  Plaintiffs do not dispute the agencies' straw-man:  FHFA does have the authority to shrink the Companies' balance sheets to make them safer institutions.  But the agencies go too far arguing that, as conservator, FHFA can dispose of *all* of the Companies' assets, liquidating their charges and leaving only some unspecified ministerial duties to "FHFA as receiver."  Indeed, nowhere does FHFA explain what *additional* authority the receiver has if, as conservator, it may decide that the Companies are "not viable" and distribute the Companies' capital outwards.  *See* Carpenter & Murphy, *supra*, at 6.  If FHFA as conservator has all three powers listed in Section 4617(a)(2)—"reorganizing, rehabilitating, [and] winding up"—FHFA as receiver must also have these three powers.  Yet FHFA does not, and indeed, cannot, explain how a receiver could simultaneously "rehabilitat[e]" a company while it is exercising its duty to liquidate that same company.  FHFA has no answer for these arguments.  *Compare* APA Br. 60, *with* FHFA Reply 11-17.  Its silence concedes that its "plain language" argument holds no water, and certainly cannot justify FHFA's request that this Court jettison decades of precedent regarding the proper role of a conservator.  Neither

FHFA nor Treasury provide any authority—no statute, case, or secondary source—to bolster its newly proposed redefinition of a conservator's role.[21]

To divert attention from its flawed arguments, FHFA contends that *Kellmer v. Raines*, 674 F.3d 848, 850 (D.C. Cir. 2012), precludes this Court from considering sources on conservatorship that pre-date HERA or what FHFA characterizes as "historical arguments." FHFA Reply 15. But *Kellmer* does not stand for that broad proposition. Taken to its fullest, that argument suggests that a court may never consider common law authorities or well-established definitions when interpreting HERA, unless those authorities post-date HERA's enactment. That is entirely backwards. Instead, the out-of-context language FHFA cites relates only to the *Kellmer* plaintiffs' claims that HERA did not affect their ability to bring a derivative suit on behalf of the Companies. 674 F.3d at 850.

FHFA also attempts to distinguish *Davis Trust Co. v. Hardee*, 85 F.2d 571 (D.C. Cir. 1936), which clearly states that conservators have been historically appointed when an entity might "later reopen and resume its corporate functions." *Id.* at 572. FHFA does not, because it cannot, challenge the accuracy of that statement. Instead, FHFA makes much of the fact that *Davis Trust*, like other cases, concluded that the sale of an asset was within a conservator's authority. *See id.*; FHFA Reply 16. But, as explained above, *supra* pp. 31-33, that a conservator may sell a particular asset does not empower a conservator to engage in self-dealing or to trade away the Companies' future. FHFA also grabs hold of language in *Davis Trust* rejecting an

---

[21] FHFA also claims that HERA treats "winding up" and "liquidation" as distinct powers—to suggest that FHFA as conservator may "wind up" the Companies—because Section 4617(b)(3)(B) requires FHFA to do certain things "involving the liquidation or winding up of the affairs of" the Companies. FHFA Reply 15 n.7. FHFA is mistaken. The conjunction "or" "can sometimes introduce an appositive—a word or phrase that is synonymous with what precedes it ('Vienna or Wien,' 'Batman or the Caped Crusader')." *United States v. Woods*, 134 S. Ct. 557, 567 (2013); *cf. De Sylva v. Ballentine*, 351 U.S. 570, 573 (1956) ("[T]he word 'or' is often used as a careless substitute for the word 'and'; that is often used in phrases where 'and' would express the thought with greater clarity[.]"). So too, here, where liquidation and winding up are used interchangeably in financial regulation.

argument "that 'conservation' contemplates only 'remaining intact.'"  FHFA Reply 16-17.  But, again, that language simply recognizes that conservators are permitted to sell assets and that the company that emerges from conservatorship need not be identical to the entity that entered.

## IV.    Treasury And FHFA Acted Arbitrarily And Capriciously.

Treasury and FHFA also seek to evade arbitrary-and-capricious review of their decision to sweep all of the Companies' net worth in perpetuity.  Their common refrain is that "the Court need not—and should not—judge the wisdom of the Conservator's actions."  FHFA Reply 55; *see also* Treasury Reply 2.  Plaintiffs do not ask this Court to determine the wisdom of their conduct (although it was certainly unwise); rather, this Court must judge the lawfulness of that conduct.  FHFA and Treasury present no valid explanation for their decision to loot the Companies and to "ensure that existing common equity holders will not have access to any positive earnings from the [Companies] in the future."  Treasury 0202; *see also* FHFA 2398.

It is clear that the Sweep Amendment was arbitrary and capricious.  *First*, Treasury and FHFA failed to consider factors required by Congress and failed to take into account the agencies' prior explanations of their statutory authority.  *Second*, Treasury and FHFA failed to engage in reasoned decisionmaking.  By relying on flawed models and stale and incomplete data, Treasury and FHFA arbitrarily and capriciously achieved their desired, pre-determined result.  *Third*, Treasury and FHFA clearly breached their fiduciary duties, which serves to highlight the irrational and self-serving nature of their decision to execute the Sweep Amendment.

### A.    Treasury And FHFA Failed To Consider The Congressionally Required Factors.

As an initial matter, Treasury and FHFA acted arbitrarily and capriciously by failing to consider factors required by Congress, and by failing to explain their departure from prior articulations of their statutory authorities.  *See* APA Br. 82-85 (citing *Verizon v. FCC*, 740 F.3d

623, 636 (D.C. Cir. 2014); *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004)).  Treasury's administrative record does not show that the agency ever explained how the Sweep Amendment was consistent with "the [Companies'] plan[s] for the orderly resumption of private market funding or capital market access" or "the need to maintain the [Companies'] status as private shareholder-owned companies."  *Id.* at 83 (quoting 12 U.S.C. § 1719(g)(1)(C)).  And FHFA never explained how the Sweep Amendment was consistent with its prior statements that conservatorships were intended to "return [the Companies] to normal business operations" and that "capital distributions" that "deplete the [Companies'] conservatorship assets" were "inconsistent" with FHFA's conservatorship obligations.  Neither agency disputes these charges, and that alone demonstrates that they have violated the APA.

### B.      Treasury And FHFA Did Not Engage In Reasoned Decisionmaking.

Having no defense for the egregious decision to sweep the Companies' net worth in perpetuity, Treasury and FHFA instead invoke a purported deference owed to the erroneous assumptions and calculations that supposedly motivated the Sweep Amendment.  Treasury Reply 43-44; FHFA Reply 57-58.  For example, Treasury claims that its "predictive judgment" is entitled to "special deference."  Treasury Reply 44.  An agency's predictive judgments may be entitled to some deference, but no deference is owed to predictions that are contradicted by the record.  *BellSouth Telecomms., Inc. v. FCC*, 469 F.3d 1052, 1060 (D.C. Cir. 2006).  And a predictive judgment is only entitled to deference if it is reasonable:  an agency may not ignore relevant data, take action without reasoned explanation, and then declare that decision a protected "prediction."  *Id.*

Indeed, in *International Ladies' Garment Workers' Union v. Donovan*—the case relied upon by Treasury to invoke deference for its "predictive judgment[s]," Treasury Reply 44—the D.C. Circuit refused to "treat the predictive nature of the judgment 'as though it were a talisman

under which any agency decision is by definition unimpeachable.'"  722 F.2d 795, 821 (D.C.

Cir. 1983) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51

(1983)).  When dealing with agency predictions, courts must "review the record and the agency's

decision to assure that 'it identified all relevant issues, gave them thoughtful consideration duly

attentive to comments received, and formulated a judgment which rationally accommodates the

facts capable of ascertainment and the policies slated for effectuation.'"  *Id.* at 822 (quoting

*Telocator Network of Am. v. FCC*, 691 F.2d 525, 544 (D.C. Cir. 1982)).

Plaintiffs have explained how the decision to execute the Sweep Amendment rested on

stale, incomplete data and erroneous assumptions, and failed to take information central to the

purported issue into account.  *See* APA Br. 75-77.  Among other shortcomings, Treasury and

FHFA failed to properly consider the Companies' deferred tax assets when entering into the

Sweep Amendment.  *See id.* at 77.  Both Treasury and FHFA seek to minimize the value of those

assets, dismissing them as "non-recurring," immaterial, "one-time gain[s]."  FHFA Reply 56;

Treasury Reply 47.  But it is undisputed that the write-down of the Companies' tax assets created

more than $98 billion of their paper losses, and that the recognition of the deferred tax assets

increased Treasury's dividend by a like amount:  a "material" consideration to any well-reasoned

decision involving the Companies' futures.  *See* FHFA 3737 (Freddie Mac disclosing $34.7

billion deferred tax assets on August 7, 2012); Treasury 2705 (Fannie Mae disclosing $64.1

billion deferred tax assets on February 29, 2012).  The claim that the deferred tax assets were not

material to the decision is also belied by the inclusion of those assets in the Companies' publicly

filed financial statements, which were prepared at FHFA's direction.[22]

---

[22]  Not surprisingly, all of the cases cited by FHFA in support of deference stand for the proposition that an agency's predictive judgments are entitled to deference only if those judgments are carefully considered, well-reasoned, and take the proper information into account.  *See* FHFA Reply 57.  For example, in *James Madison Ltd. by Hecht v.*

*(Cont'd on next page)*

In FHFA's litigating declaration, Mr. Ugoletti claims that at the time of the Sweep Amendment, FHFA had not "discussed" deferred tax assets with the Companies, and neither FHFA nor Treasury envisioned that the deferred tax assets would be recognized in 2013.  FHFA 0009-0010.  The ongoing discovery in the Court of Federal Claims may contradict this facially implausible assertion, but even if it does not, the omission hardly reflects responsible conservatorship or prudent financial decisionmaking.  *See* FHFA Reply 56; Treasury Reply 47. Either the failure to consider the deferred tax assets was a glaring omission, or it was a knowing and strategic decision to justify the Sweep Amendment and line the government's coffers; in either event, the decisionmaking was arbitrary and capricious.

Similarly, Treasury strains to defend its contrived use of various predictive scenarios, claiming that it expected a return under the Sweep Amendment that "would be 'materially equivalent'" to the return absent the Sweep Amendment.  Treasury Reply 51 & n.22.  But as Plaintiffs have explained, that expectation was true under only one of the scenarios modeled by Treasury at the time—all the others showed that Treasury would receive more under the Sweep Amendment.  APA Br. 72.  Treasury again invokes its "predictive judgment" to whitewash these discrepancies.  Treasury Reply 51 n.22.  But such deference plainly requires more consideration than Treasury provided.  *See Int'l Ladies' Garment Workers' Union*, 722 F.2d at 822.  Treasury

---

*(Cont'd from previous page)*

*Ludwig*, 868 F. Supp. 3 (D.D.C. 1994), the court made clear that no deference was owed to predictive judgments if an agency decision lacked a rational basis.  *Id.* at 8-9; *see also id.* at 9 (holding it arbitrary and capricious that the agency "specifically set out to find the [banks] insolvent and place them in receivership, regardless of their true financial state," and that "examiners had been derelict in their duties, classifying loans at whim and pulling numbers out of air rather than actually examining bank records and performing necessary calculations"); *Domestic Sec., Inc. v. SEC*, 333 F.3d 239, 249 (D.C. Cir. 2003) (upholding an SEC order because it was "obvious that the Commission considered the evidence and the alternatives presented to it"); *GTS 900F, LLC v. FDIC*, No. 11-cv-06607, 2012 WL 2086305, at *8 (C.D. Cal. June 1, 2012) (holding that FDIC took "rational action" because it "established that it looked at relevant data, including cash flow projections and analyses of the real estate market"); *cf. Dorris v. FDIC*, No. Civ. 93-1659, 1994 WL 774535, at *5 (D.D.C. Oct. 27, 1994) (upholding FDIC decision under substantial evidence standard).  Here, Treasury and FHFA set out to justify the Sweep Amendment and acted arbitrarily by, among other things, ignoring the most recent relevant data showing that the Companies' forecasts were improving.

and FHFA failed on these fronts, ignoring key aspects of the purported issue and relying only on outdated, incomplete forecasts to justify the Sweep Amendment.

Treasury and FHFA attempt to further patch the Sweep Amendment by emphasizing the "circularity" of the Companies drawing on Treasury funds to pay Treasury's dividend. Treasury Reply 43, 47; FHFA Reply 53. Setting aside whether this circularity was a legitimate concern at the time (especially considering the relevant forecasts that should have been considered and that the Companies were not required to pay cash dividends, *see supra* pp. 34-35), the agencies have merely identified a potential problem; they have utterly failed to explain how the Sweep Amendment was a rational answer to that problem. *State Farm*, 463 U.S. at 52-55. In particular, Treasury and FHFA do not explain how sweeping the Companies' net worth to Treasury in perpetuity would "maintain the GSEs' viability," Treasury Reply 46, the Sweep Amendment's purported goal. At most, the agencies claim that the Sweep Amendment was needed to "maintain investor confidence" and send a "message" to the market. Treasury Reply 44; FHFA Reply 56. But nowhere do the agencies offer substantial evidence establishing the existence of this purported problem or explain how an amendment that makes it impossible for the Companies to retain any capital helps to assure the market of their long-term viability. *See* Supp. Br. 5-7.

FHFA also seeks to prop up the Sweep Amendment by claiming—with no support in the record except for its after-the-fact litigation declaration—that the Companies instead could have been compelled to pay a Periodic Commitment Fee that was "incalculably large." FHFA Reply 53. But as Plaintiffs have explained, the Purchase Agreements require Treasury and the Companies to set the Periodic Commitment Fee by mutual agreement, subject to "reasonable discretion." FHFA 0133; *see supra* pp. 25-26; APA Br. 70-72. Commitment fees in loan

agreements are not "incalculably large," but rather "usually var[y] between 0.25 percent per annum and 0.50 percent per annum." *Stern*, *supra*, ¶ 1.05[2][A].  And over time, commitment fees *decrease* because such fees are assessed "on the average daily unused portion" of the commitment, which necessarily decreases as the borrower draws down the commitment.  *Id.*; *see also* Tobias Berg *et al.*, The Total Costs of Corporate Borrowing:  Don't Ignore the Fees 7 (May 8, 2013) (discussing a "commitment fee" based on the "undrawn amount"), https://www.chicagofed.org/digital_assets/others/events/2013/bank_structure_conference/berg_s aunders_steffen_050813_session120.pdf.  FHFA's claim that the Periodic Commitment Fee could have been used to strip the Companies of their net worth is simply wrong—any exercise of "reasonable discretion" would have to have been consistent with FHFA's statutory mandate, its duties as conservator, market practice, and its responsibilities under the APA.  *See supra* pp. 25-26.

    Lacking any substantive argument that the Periodic Commitment Fee somehow justifies the Sweep Amendment, FHFA again seeks to evade judicial review altogether, claiming that Plaintiffs have no "standing" to raise arguments regarding "their own interpretation of the [Purchase Agreements]."  FHFA Reply 54.  This argument is wholly misplaced.  If FHFA is to rely on the alternative prospect of the Periodic Commitment Fee to justify the Net Worth Sweep, FHFA must show that its analysis is based on a rational assessment of the two alternatives.  It cannot reach back to prudential standing doctrines, *see* FHFA Reply 54 & n.34 (citing *Deutsche Bank Nat'l Trust Co. v. FDIC*, 717 F.3d 189, 194 (D.C. Cir. 2013)), to block scrutiny of its analysis of the alternatives.  Unlike breach of contract actions, APA challenges invoking government agreements are not limited to parties and third-party beneficiaries.  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) ("The

[prudential standing] test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." (citations and internal quotation marks omitted)).  And here, FHFA's suggestion that it could be compelled to agree to a Periodic Commitment Fee at wipe-out levels is irreconcilable with the terms of the Purchase Agreements, with market practice, and with FHFA's duties as a conservator.

The decision to execute the Sweep Amendment was arbitrary and capricious for the additional reason that Treasury and FHFA did not consider reasonable alternatives, as required under the APA.  APA Br. 79-82.  The agencies do not dispute that they were required to "consider such alternatives, and to explain why such alternatives were not chosen."  *Int'l Ladies' Garment Workers' Union*, 722 F.2d at 815.  Even if, as the agencies contend, they were not required to consider or adopt the specific alternatives suggested by Plaintiffs, *see* Treasury Reply 48-51; FHFA Reply 53-55, the agencies point to nothing in the record showing a reasoned consideration of *any* alternatives at the time of the challenged action.  And their *post hoc* attacks on these alternatives lack merit.

With regard to the obvious solution of the Companies paying Treasury's dividend in kind, Treasury and FHFA characterize this option—provided for in the Purchase Agreements— as a "penalty" that would have been "more expensive" than making the 10% dividend payments. Treasury Reply 49; FHFA Reply 55.  The characterization of this option as a penalty is unsupported by the Purchase Agreements, which include no such suggestion.  And the notion that the payment-in-kind option would have been "more expensive" is flatly wrong.  This option required payment of zero cash, and would have added only to Treasury's liquidation preference, an amount to be paid in the event of *liquidation*.  There is no support for the claim that the

payment-in-kind option was "more expensive" than quarterly cash payments of nearly $5 billion.

Nor is there any support for FHFA's claim that the exercise of this option would have harmed

market confidence, *see* FHFA Reply 55, any more than borrowing from Treasury to pay

Treasury.  Indeed, there is no evidence in FHFA's "document compilation" to support it.[23]

Similarly, Treasury claims that it did not have authority to refinance to establish a lower

dividend rate or amend the agreements such that the Companies could have paid down

Treasury's liquidation preference.  Treasury Reply 50 (quoting *Union Nat'l Bank of Chi. v.*

*Weaver*, 604 F.2d 543, 545 (7th Cir. 1979)).  But *Weaver* says only that the government may not

"waive contractual rights that have accrued to the U.S. or . . . modify existing contracts *to the*

*detriment of the Government* without adequate legal consideration or a compensating benefit

flowing to the Government."  604 F.2d at 545 (emphasis added).  Allowing the Companies to

redeem the government's stock at its preexisting value would not have been to the government's

detriment because the Companies would have paid the government for the value of its

investment.  And to the extent reducing the dividend rate worked to government's detriment,

under Treasury's assumptions it would have received a corresponding benefit from reducing the

future draws on its funding commitment and from a likely increase in the value of its warrants.

### C.    Treasury And FHFA Acted Arbitrarily And Capriciously By Breaching Their Fiduciary Duties To The Companies' Shareholders.

Treasury and FHFA acted arbitrarily and capriciously by breaching their fiduciary duties

to preferred shareholders.  APA Br. 85-88.  Treasury responds that Plaintiffs' APA claims

actually sound in breach of contract and are thus governed by the Tucker Act.  Treasury Reply

---

[23]  Even if Defendants' litigation-driven *post hoc* attacks on the payment-in-kind option had merit, their acknowledged failure to consider that alternative before adopting the Sweep Amendment would still be fatal under the APA.  *See Int'l Union, United Mine Workers of Am. v. MSHA*, 626 F.3d 84, 94 (D.C. Cir. 2010) ("[W]hen Congress has delegated a determination of policy judgment to the agency alone, the courts may not accept . . . counsel's post hoc rationalizations for agency action." (internal quotation marks and alterations omitted)).

39.  Treasury errs.  Plaintiffs "seek relief from Treasury's and FHFA's arbitrary and capricious

decision to execute the Sweep Amendment in violation of the APA," and the breach of fiduciary

duties simply serves to "embod[y] and illuminate[] that violation."  APA Br. 88 n.32.

Treasury argues that "controlling circuit authority" dictates otherwise, citing *Megapulse,*

*Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982).  Treasury Reply 39.  But *Megapulse* holds that "a

plaintiff whose claims against the United States are *essentially contractual* should not be allowed

to avoid the jurisdictional (and hence remedial) restrictions of the Tucker Act by casting its

pleadings in terms that would enable a district court to exercise jurisdiction under a separate

statute and enlarged waivers of sovereign immunity, as under the APA."  672 F.2d at 967

(emphasis added).  Here, Plaintiffs' claims are solidly grounded in the APA, based on Treasury's

and FHFA's violation of their statutory authority and arbitrary and capricious decisionmaking.

Those claims are not "essentially contractual."  *Id.*  Moreover, the D.C. Circuit in *Megapulse*

expressly rejected the "broad" argument that "any case requiring some reference to or

incorporation of a contract is necessarily on the contract and therefore directly within the Tucker

Act."  *Id.* at 967-68.  Indeed, agencies cannot "avoid injunctions against activities violative of a

statutory duty," "simply because the same action might also amount to a breach of contract."  *Id.*

at 971.  Treasury's and FHFA's fiduciary duty violations illustrate how the agencies acted

arbitrarily and capriciously.  Thus, even if Plaintiffs' fiduciary duty allegations arose out of their

preferred stock contracts (and they do not, *see, e.g., Parfi Holding AB v. Mirror Image Internet,*

*Inc.*, 817 A.2d 149, 156-57 (Del. 2002) (fiduciary duties "are independent of any contract")), the

mere implicit reference to Plaintiffs' preferred stock contracts could not be used to shield the

agencies from APA review.  The remedy Plaintiffs request is an APA remedy.

Treasury also argues that any APA claim based on a violation of fiduciary duties would fail because "the APA does not require Treasury to consider policies embodied in sources of law other than HERA." Treasury Reply 39. This cramped reading of the relevant case law is also wrong. Treasury cites *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633 (1990), which held that the administrator of a government insurance program need not consider other areas of federal law when the enabling statute explicitly required that the administrator consider its duties under ERISA. *Id.* at 645-46. "Given this specific and unambiguous statutory mandate," the administrator properly focused on its duties under ERISA, and it may have been problematic to require the administrator to consider public policies from all areas of federal law. *Id.* at 646. But this language cannot mean that an agency cannot be held to have acted arbitrarily and capriciously by violating a law other than its enabling statute. *See also Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 934 (D.C. Cir. 2008) (agency policy could be vacated for failing to take into account concerns under other laws). Indeed, the APA is a source of law "other than HERA" that unquestionably provides a basis to vacate agency action. HERA does not preclude Treasury and FHFA from considering and adhering to other background laws in carrying out their duties. That Treasury and FHFA violated their fiduciary duties highlights the arbitrary and capricious nature of the decision to execute the Sweep Amendment.

## V.      Vacatur Is Required.

If this Court concludes that the agencies violated the APA by acting in excess of their statutory authorities or arbitrarily and capriciously, it must vacate the Sweep Amendment. Neither agency contends that any other remedy is appropriate with respect to Plaintiffs' claims that the agencies exceeded their statutory authorities.

Treasury, however, argues in a footnote that if this Court concludes that it acted arbitrarily and capriciously, only remand is required, because the agency may be able to offer

"additional explanation." Treasury Reply 52 n.23. Treasury is mistaken. In APA cases, "when a reviewing court determines that agency regulations are unlawful," "the ordinary result is that the rules are vacated." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *see also Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (holding that if a party "prevails on its APA claim, it is entitled to relief under that statute, which normally will be vacatur of the agency's order"); Administrative Conference of the United States, Remand Without Vacatur, 78 Fed. Reg. 76,269, 76,272 (Dec. 17, 2013) (observing that remand without vacatur "deviates from customary remedial norms").

To be sure, the D.C. Circuit has recognized a narrow exception where the deficiency in an agency's decision is not particularly serious and vacatur would have highly disruptive consequences or effectively deny the plaintiff the relief it seeks. *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993); *see Sierra Club v. EPA*, 167 F.3d 658, 664 (D.C. Cir. 1999) (declining to vacate where plaintiff "expressly requested that [the Court] leave the current regulations in place during any remand"). But neither factor supports the unusual remedy Treasury proposes. First, the flaws in the rationale for the Sweep Amendment are fundamental and could not be corrected on remand, for any decision on remand would need to account for the Companies' performance over the last two years. Second, although Treasury asserts that vacatur "would be highly disruptive for the housing market," Treasury Reply 52 n.23, exactly the opposite is true. If the Companies are allowed to recover from their zombie-like status and build capital reserves, that will powerfully reassure the markets of the Companies' viability.

The cases cited by Treasury do not suggest a different approach. The Supreme Court's observation in *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985), that "remand" is

the "proper course" when the administrative record is insufficient for the reviewing court to make a determination does not imply that a court should not also vacate the underlying agency decision. Indeed, the D.C. Circuit vacates agency decisions that are inadequately explained without any suggestion that *Florida Power & Light* requires a different result. *E.g.*, *BNP Paribas Energy Trading GP v. FERC*, 743 F.3d 264, 266 (D.C. Cir. 2014); *Ind. Boxcar Corp. v. R.R. Ret. Bd.*, 712 F.3d 590, 593 (D.C. Cir. 2013); *GameFly, Inc. v. Postal Regulatory Comm'n*, 704 F.3d 145, 146 (D.C. Cir. 2013). Similarly, nothing in *Delta Air Lines, Inc. v. Export-Import Bank of the United States*, 718 F.3d 974 (D.C. Cir. 2013) (per curiam), or *Heartland Regional Medical Center v. Sebelius*, 566 F.3d 193 (D.C. Cir. 2009), suggests that remand without vacatur is anything other than an atypical form of relief that the courts will deploy only when the agency decision is likely to survive judicial review with additional explanation and when vacatur in the meantime would upset significant reliance interests.

## CONCLUSION

The Sweep Amendment is an unprecedented example of agency overreach. In an effort to implement the Administration's desire to wind down the Companies, Treasury ignored the expiration of its statutory authority and FHFA shed its mandate to "preserve and conserve" the Companies' assets. The agencies' factually unsupportable *post hoc* rationalizations only illustrate the total disregard for their statutory mandates and the absence of reasoned decisionmaking leading up to the Sweep Amendment. This Court should vacate the illegal and arbitrary Sweep Amendment.

Respectfully Submitted,

Dated:  June 2, 2014

/s/ Charles J. Cooper
Charles J. Cooper, SBN 24870
Vincent J. Colatriano, SBN 429562
David H. Thompson, SBN 450503
Peter A. Patterson, SBN 998668
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C.  20036
Telephone:  202.220.9600
Facsimile:  202.220.9601

*Attorneys for Plaintiffs Fairholme Funds, Inc., et al.*

/s/ Drew W. Marrocco
Drew W. Marrocco, SBN 452305
DENTONS US LLP
1301 K Street, N.W., Suite 600, East Tower
Washington, D.C.  20005
Telephone: 202.408.6400
Facsimile: 202.408.6399

Michael H. Barr (*Pro Hac Vice*)
Richard M. Zuckerman (*Pro Hac Vice*)
Sandra Hauser (*Pro Hac Vice*)
DENTONS US LLP
1221 Avenue of the Americas
New York, N.Y.  10020
Telephone: 212.768.6700
Facsimile: 212.768.6800

*Attorneys for Plaintiffs Arrowood Indemnity Co., et al.*

/s/ Theodore B. Olson
Theodore B. Olson, SBN 367456
Douglas R. Cox, SBN 459668
Matthew D. McGill, SBN 481430
Nikesh Jindal, SBN 492008
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:  202.955.8500
Facsimile:  202.467.0539

Janet M. Weiss (*Pro Hac Vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, N.Y.  10166
Telephone: 212.351.3988
Facsimile: 212.351.5234

*Attorneys for Plaintiff Perry Capital LLC*